IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION


GREGORY SOLOMON, et al.,

       Plaintiffs,

v.                            CASE NO.  TCA 85-7009-MMP
                                      TCA 85-7010-MMP

LIBERTY COUNTY, FLORIDA,
et al.,

       Defendants.

_____/

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### *Gingles Jingle*

*The Supreme Court's edict on vote dilution*
*Attempted to offer a legal solution*
*To district courts struggling to try the cases*
*Arising from friction between the races.*

*But confusion reigned Supreme*
*After reading Brennan's theme.*
*Are results the only key?*
*Do statistics open sesame?*

*Do the experts' opinions control the query?*
*Do we listen to history until we become weary?*
*Does it give "effect" to Congress' "intent"*
*To disregard "intent" to all extent?*

*Is the race of the candidate relevant?*
*Is success at the polls significant?*
*Does racial bloc voting rule the day?*
*Does "totality of circumstances" still have a say?*

*When Solomon went en banc, we said a prayer,*
*That the Eleventh Circuit would clear the air,*

OFFICE U.
U.S. DISTR CT.
NORTH DIV. C.
CAP.

97 MAR 31 PM 4: 53

ENTERED ON DOCKET 4/1/97 BY *do*
[Rule 58 & 79(a) FRCP or 32(d)(1) & 55 FRCRP]
Copies mailed to: Hosford, Lacroix, Lipman,
Weisberg, COB

FILED

154

> *But alas, alas, they went five-five*
> *All we got was some more jive.*
>
> *The questions remain to this good day*
> *For the courts to unravel through much legal fray.*
> *The attempt to decipher the Gingles test*
> *is tedious, exhausting, and trying, at best!*
>
> Jeana Peeler Hosch,
> Law clerk to District Judge Robert Propst[1]

Hard cases make bad law.[2]  Sometimes, as is the case here, hard cases make no law at all.  On appeal, the Eleventh Circuit was evenly divided in its interpretation of Thornburg v. Gingles, 478 U.S. 30, 106 S. Ct. 2752, 92 L. Ed. 2d 25 (1986), and section 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973.  Solomon v. Liberty County, 899 F.2d 1012 (11th Cir. 1990) (per curiam) (en banc).  Specifically, the Eleventh Circuit expressed no controlling opinion on whether a plaintiff can make out a section 2 challenge simply by satisfying the three Gingles

---

[1]  This poem originally appeared in the July, 1990, edition of *The Gavel Gazette*, the Eleventh Circuit District Judges Newsletter.

[2]  See generally Northern Securities Co. v. United States, 193 U.S. 197, 400-01, 24 S. Ct. 436, 468, 48 L. Ed. 679 (1904), where Justice Holmes observed:

> Great cases, like hard cases, make bad law.  For great cases are called great, not by reason of their real importance in shaping the law of the future, but because of some accident of immediate overwhelming interest which appeals to the feelings and distorts the judgment.  These immediate interests exercise a kind of hydraulic pressure which makes what previously was clear seem doubtful, and before which even well settled principles of law will bend.

Id. at 400-01, 24 S. Ct. at 468 (Holmes, J., dissenting).

factors, see Solomon, 899 F.2d at 1021 (Kravitch, J., specially concurring), or if a defendant can defeat a section 2 challenge by raising a lack of racial bias defense after a plaintiff has demonstrated these Gingles factors, see Solomon, 899 F.2d at 1033 (Tjoflat, C.J., specially concurring). Instead, the Solomon court left it to this Court on remand to give "due consideration to the views expressed in Chief Judge Tjoflat's and Judge Kravitch's specially concurring opinions." 899 F.2d at 1013. The Court now proceeds to fulfill this mandate, mindful that in so doing, it must speak to an issue that the Eleventh Circuit has been unsuccessful in resolving on several occasions during the last decade.[3]

BACKGROUND:

In 1985, four black residents and registered voters in Liberty County, Florida, began a journey that has slowly taken

---

[3]   Since Solomon, two en banc panels of the Eleventh Circuit were also unable to fully clarify the standards under Gingles. See Southern Christian Leadership Conference v. Sessions, 56 F.3d 1281 (11th Cir. 1995) (en banc), cert. denied, ___ U.S. ___, 116 S. Ct. 704, 133 L. Ed. 2d 660 (1996), and Nipper v. Smith, 39 F.3d 1494 (11th Cir. 1994) (en banc), cert. denied, ___ U.S. ___, 115 S. Ct. 1795, 131 L. Ed. 2d 723 (1995). In addition, a number of this Circuit's panels have expressly declined to reach the issue of what happens once a plaintiff demonstrates the three Gingles factors. See Meek v. Metropolitan Dade County, 985 F.2d 1471, 1487 (11th Cir. 1993) ("Meek II"); Hall v. Holder, 955 F.2d 1563, 1568 n.9 (11th Cir. 1992), rev'd, 512 U.S. 874, 114 S. Ct. 2581, 129 L. Ed. 2d 687 (1994); Meek v. Metropolitan Dade County, 908 F.2d 1540, 1544, 1549 (11th Cir. 1990), reh'g denied, 918 F.2d 184, cert. denied, 499 U.S. 907, 111 S. Ct. 1108, 113 L. Ed. 2d 217 (1991). See also DeGrandy v. Wetherell, 815 F. Supp. 1550, 1563 (N.D. Fla. 1992) (three judge panel) (holding that a section 2 violation was shown under both Chief Judge Tjoflat's and Judge Kravitch's respective approaches), aff'd in part, rev'd in part by Johnson v. DeGrandy, 512 U.S. 997, 114 S. Ct. 2647, 129 L. Ed. 2d 775 (1994).

them through the judicial thicket of the Voting Rights Act.  They
sought, on behalf of themselves and the certified class of all
black residents of Liberty County, Florida, injunctive and
declaratory relief against at-large countywide elections for
members of the Liberty County School Board and the Liberty County
Commission.[4]  Plaintiffs alleged that the at-large election of
members of the Liberty County Commission unlawfully diluted black
voting strength in violation of section 2 of the Voting Rights
Act, 42 U.S.C. § 1973.  Similarly, Plaintiffs alleged that the
at-large election of members of the Liberty County School Board
unlawfully diluted black voting strength in violation of section
2 of the Voting Rights Act, as well as the Fourteenth and
Fifteenth Amendments to the United States Constitution.[5]

In March, 1986, the Court conducted a five day bench trial
in this matter.  See Doc. 49, *Mins.*; Docs. 77-82, *Tr.*
(*hereinafter "1986 Tr."*).  In May, 1987, the Court issued its
findings.  The Court held that Plaintiffs had failed to
demonstrate unlawful dilution in violation of either section 2 or
the Constitution, and entered judgments as to all claims in favor
of Defendants.  See Doc. 67, *Findings of Fact and Conclusions of
Law* (*hereinafter "Findings"*).

---

[4]  One of the original plaintiffs, Earl Jennings, was
dismissed as a plaintiff and substituted as a defendant, after he
was elected to the Liberty County Commission.  See Doc. 106.

[5]  Plaintiffs originally filed two separate causes of action,
case numbers 85-7009 and 85-7010 (N.D. Fla.), which were later
consolidated under case number 85-7009 for purposes of trial
pursuant to Rule 42(a), FED. R. CIV. P.  See Doc. 38.

4

On appeal, a panel of the Eleventh Circuit initially vacated the judgments, and remanded with instructions to make further findings of fact. Solomon v. Liberty County, Florida, 865 F.2d 1566 (11th Cir. 1988), vacated, 873 F.2d 248 (11th Cir. 1989). In 1989, the Eleventh Circuit reheard this case en banc. In 1990, the en banc panel issued the per curiam mandate which is presently before the Court, and is the subject of this order. See Solomon, 899 F.2d at 1013. Further proceedings on remand were stayed until the Supreme Court ruled on Defendants' petition for writ of certiorari. See Doc. 98. In January, 1991, the Supreme Court denied Defendants' petition. Liberty County v. Solomon, 498 U.S. 1023, 111 S. Ct. 670, 112 L. Ed. 2d 663 (1991).

Defendants then jointly moved to re-open the case for the submission of additional evidence.[6]  Doc. 107. This motion was granted, and the parties were given 45 days within which to conduct discovery. See Doc. 121. In October, 1991, Defendants filed motions for summary judgment [Docs. 122 & 123], to decertify the plaintiff class, and to amend the pleadings to conform to the evidence [Docs. 124 & 125]. In December, 1991, the Court held a one half-day retrial to take the parties' supplemental evidence. See Doc. 130, Mins.; Doc. 152, Tr. (hereinafter "1991 Tr."). In November, 1993, after hearing oral

---

[6]  This additional evidence included certain 1990 census figures, results from the 1990 at-large county elections, and the results of two referenda elections held in September of 1990, in which proposals to change to single-member districts for both Liberty County Commission and Liberty County School Board elections were defeated by the voters of Liberty County. See Doc. 107.

arguments on all of the pending motions [see Doc. 140], the Court granted the motions to decertify[7] and to amend[8], and denied the motions for summary judgment.  See Doc. 141.

There was no further activity in this case until October, 1995, when Plaintiffs filed a motion requesting that the Court enter final judgment.  Doc. 144.  However, in the Plaintiffs' certificate of conference pursuant to Local Rule 6(B), they indicated that counsel for Defendant Liberty County felt that their motion should be kept in abeyance until the Supreme Court's pending resolution of two Voting Rights Act cases, Shaw v. Hunt and Bush v. Vera.  See Doc. 143.  Consequently, the Court took no

---

[7]   In March, 1985, the Court certified this lawsuit "as a class action consisting of all black residents of Liberty County, Florida."  Doc. 11.  After remand, Defendants moved to decertify on the grounds that, inter alia, (1) the claims of the named representative plaintiffs were not typical of the claims of the class, and (2) the named representative parties would not fairly and adequately protect the interests of the class, as required by Rule 23(a), FED. R. CIV. P.  Docs. 124 & 125.  The Court granted Defendants' motion, noting that "many members of the plaintiff class, and some of the named plaintiffs, have become equivocal or are downright opposed to the maintenance of this lawsuit."  Doc. 141 at 3 (citing to Findings).  The Court also cited to the testimony of some of the Plaintiffs, who indicated that they opposed single-member districts.  Finally, the Court relied upon the results of two September, 1990, county-wide referenda, separately conducted by the County Commission and School Board, which demonstrated that blacks in Solomon County rejected the adoption of single-member districts by a 3 to 2 margin.  See Doc. 141 at 2-6.

[8]  Defendant Liberty County School Board had sought leave to amend its answer to assert the following affirmative defense: that Plaintiffs did not exhaust their administrative remedies before commencing this action, since they failed to first petition Defendant to conduct a referendum election on the establishment of single-member districts in School Board elections.  See Doc. 124 at 12-16.  The Court granted Defendant's motion for the limited purpose of preserving the issue for appeal, finding that it would otherwise have no bearing on this lawsuit.  See Doc. 141 at 8.

additional action until September, 1996, after the Supreme Court issued its rulings in Shaw, ___ U.S. ___, 116 S. Ct. 1894, 135 L. Ed. 2d 207 (1996), and Vera, ___ U.S. ___, 116 S. Ct. 1941, 135 L. Ed. 2d 248 (1996).  At that time, the Court ordered Defendants to file a responsive memorandum to Plaintiffs' motion, providing Plaintiffs with an adequate opportunity to file a reply brief. See Doc. 146.  The parties responded by filing supplemental memoranda and new proposed findings.  See Docs. 147, 149-151.

It has been said that justice delayed is justice denied. Nevertheless, the Court believes that two sets of circumstances which have taken place since this case was remanded by the Eleventh Circuit will now offer the parties the sense of justice to which they are clearly entitled.[9]  First, although there is still no consensus on the proper application of the Gingles preconditions and totality of the circumstances test, intervening case law has greatly clarified the proper analysis under section 2 and has helped provide a path --- albeit a rocky one --- upon which the Court may venture to get this case out of the judicial thicket.  With the benefit of these decisions, the Court hopes that the course which it now plots will get the parties, both Plaintiffs and Defendants, to a destination that any appellate review will deem to be proper in view of the relevant facts and law.  Second, developments in Liberty County since the 1986 trial

---

[9]  However, a sense of finality in this case remains a different matter altogether.  The Court is keenly aware that the sensitive nature of the issues addressed herein, not to mention the absence of any controlling authority in this Circuit, makes the Court's order a strong candidate for appellate review.

have made this case more susceptible to final resolution.
Results of a number of intervening elections, not to mention the
1990 census, are of particular import.  Twelve years after the
Plaintiffs entered a federal courthouse in Tallahassee seeking
relief, the Court can only hope that its due consideration to the
divided Circuit Court's opinions, see Solomon, 899 F.2d at 1013,
will provide them with some form of relief --- even if it is
limited solely to the absence of further proceedings in this
cause.

**DISCUSSION:**

This case presents a number of legal and factual
complexities beyond those which the Court has found to be common
in section 2 lawsuits.  In fact, the Court is in the somewhat
unique, and unenviable, position on remand of determining the
governing legal standard for evaluating Plaintiffs' claims.  The
Court's task is further complicated (or simplified, depending
upon one's perspective) by the Eleventh Circuit's holding that
the three Gingles factors have been established in this case as a
matter of law.  See Solomon, 899 F.2d at 1013; id. at 1037
(Tjoflat, C.J., specially concurring); id. at 1017 (Kravitch, J.,
specially concurring).  Consequently, it will be necessary to
tailor the analysis accordingly.

Part I of this opinion squarely addresses the issue which
the Eleventh Circuit has been unable to resolve.[10]  It begins

---

[10]   This discussion is, of course, necessitated by the
conflicting views presented in Solomon.  As is discussed in greater
detail in Section I, *infra*, Judge Kravitch indicated that the

*8*

with a discussion of section 2, including an examination of the
1982 amendment to the Voting Rights Act, to set the context for
the dialogue that followed between Judges Tjoflat and Kravitch in
Solomon.  This dialogue is then briefly set out, both as it
appeared in Solomon, and as it resurfaced in Nipper v. Smith, 39
F.3d 1494 (11th Cir. 1994) (en banc), cert. denied, ___ U.S. ___,
115 S. Ct. 1795, 131 L. Ed. 2d 723 (1995).  The dialogue is next
examined in light of recent Supreme Court jurisprudence, other
interpretive case law, and the legislative history of the 1982
amendment.  Finally, after coalescing all of this material, the
Court concludes this section by setting forth a model framework
for section 2 cases which it believes is most consistent with
congressional intent.

    Part II briefly discusses the law of the case and mandate

---

Plaintiffs were only required to demonstrate the three Gingles
factors.   Solomon, 899 F.2d at 1021 (Kravitch, J., specially
concurring).  Since the en banc panel unanimously agreed that the
three factors had been satisfied in this case [Solomon, 899 F.2d at
1013], under Judge Kravitch's approach the Plaintiffs have already
succeeded in proving their section 2 claim.   Solomon, 899 F.2d at
1021 (Kravitch, J., specially concurring) ("Having reviewed the
uncontroverted evidence below, I conclude that appellants have met
all three Gingles requirements.  This is all the Supreme Court
requires, and I may require no more.").  See also Solomon, 899 F.2d
at 1037 (Tjoflat, C.J., specially concurring) ("Judge Kravitch
would hold as a matter of law that the appellants have succeeded in
their claim under Gingles and section 2.").  Conversely, Judge
Tjoflat indicated that the Court must still examine Plaintiffs'
claims in light of the totality of the circumstances, in order to
determine whether Plaintiffs were "denied meaningful access to the
political process 'on account of race or color.'"   Id. at 1035
(Tjoflat, C.J., specially concurring).  Thus, the Court must first
determine, pursuant to the Eleventh Circuit's mandate [Solomon, 899
F.2d at 1013], the appropriate framework for analyzing Plaintiffs'
section 2 claims.   Only then can the Court determine whether it
needs to make additional factual findings, and, if so, the scope of
that factual inquiry.

rules.  The parties, Defendants in particular, have requested
that the Court reexamine certain matters which the Eleventh
Circuit has already concluded have been established as a matter
of law.  Thus, this discussion is required to describe the extent
to which the Court may engage in such an inquiry.

Part III fulfills the Eleventh Circuit's mandate by making
appropriate findings of fact and conclusions of law in light of
the framework set forth in Section I.  The matters examined by
the Court encompass evidence presented at the initial trial in
1986 and the retrial in late 1991, in addition to all other
relevant materials contained in the record.

### Part I.    Analytical Framework:

The Senate Report accompanying the 1982 amendment to Title
42, United States Code, Section 1973, states that "[t]he
'results' test to be codified in section 2 is a well defined
standard."  See S. REP. No. 417, 97th Cong., 2d Sess. 16 (1982),
reprinted in 1982 U.S.C.C.A.N. at 193 (hereinafter "S. Rep.").
However, this statement is belied by the record of this, and
other, section 2 cases.  The inability of the Eleventh Circuit to
speak with clarity on the appropriate standard for vote dilution
cases, even with the benefit of the Senate Report accompanying
the 1982 amendment, is understandable.  As Judge Tjoflat aptly
recognized in Solomon, "[b]ecause the amendment reflects a
compromise between two very different views in the Congress that
passed the 1982 amendment to section 2, much of that section's
language seems inherently inconsistent and, at times, virtually

meaningless." 899 F.2d at 1022 (Tjoflat, C.J., specially
concurring). The discussion which follows will attempt to
reconcile these inconsistencies, and set forth an appropriate
model of analysis for section 2 claims.

A.   **Section 2 Of The Voting Rights Act Of 1965:**

In 1965, Congress passed the Voting Rights Act[11], in order
"to rid the country of racial discrimination in voting." South
Carolina v. Katzenbach, 383 U.S. 301, 315, 86 S. Ct. 803, 812, 15
L. Ed. 2d 769 (1966). See also H.R. Rep. No. 439, 89th Cong., 1st
Sess. 23 (1965), reprinted in 1965 U.S.C.C.A.N. 2437, 2440 (Act
intended to redress "the systematic exclusion of Negroes from the
polls that characterizes certain regions of this Nation.").
Specifically, "[t]he Act was drafted to make the guarantees of
the Fifteenth Amendment finally a reality for all citizens,"
Allen v. State Bd. of Elections, 393 U.S. 544, 556, 89 S. Ct.
817, 826, 22 L. Ed. 2d 1 (1969), by ensuring that no citizen's
right to vote shall "be denied or abridged . . . on account of
race, color, or previous condition of servitude." U.S. Const.
amend. 15. As originally enacted, section 2 provided:  "No
voting qualification or prerequisite to voting, or standard,
practice, or procedure shall be imposed or applied by any State
or political subdivision to deny or abridge the right of any
citizen of the United States to vote on account of race or
color." Pub. L. No. 89-110, 79 Stat. at 437 (codified as amended

---

[11]   Pub. L. No. 89-110, 79 Stat. 437 (codified as amended at
42 U.S.C. §§ 1971, 1973 to 1973bb-1 (1982)).

11

at 42 U.S.C. § 1973(a)).

At the time it was adopted, section 2 was widely viewed as having the same scope as the Fifteenth Amendment, which used similar language. Case law interpreting vote dilution claims supported the proposition that a plaintiff could proceed under either the so-called "intent" test, or the "results" test, the standards used for discrimination claims brought under the Constitution. See, e.g., Zimmer v. McKeithen, 485 F.2d 1297, 1304 (5th Cir. 1973) (en banc), aff'd on other grounds sub nom. East Carroll Parish Sch. Bd. v. Marshall, 424 U.S. 636, 96 S. Ct. 1083, 47 L. Ed. 2d 296 (1976).[12] Thus, under the prevailing interpretation of the Fourteenth and Fifteenth Amendments, a violation of section 2 could be established by showing either a discriminatory purpose or discriminatory results. See S. Rep. at 17-19, 1982 U.S.C.C.A.N. at 194-96.

1.    The "Results Test":

In Whitcomb v. Chavis, 403 U.S. 124, 91 S. Ct. 1858, 29 L. Ed. 2d 363 (1971), the Supreme Court laid the framework for what was to become the "results test." Whitcomb involved a Fourteenth Amendment challenge by black voters to a multi-member districting plan. The Whitcomb plaintiffs did not provide any evidence of discriminatory intent, but instead attempted to prove that the challenged plan resulted in a dilution of their ability to have equal access to the political process. See id. at 144, 149, 91

_____

[12]    See also discussion of White and Whitcomb in Section I(A)(1), infra.

S. Ct. at 1869, 1872. The lower court had sustained the plaintiffs' challenge, finding that black voters in what the court termed a "ghetto area" were consistently underrepresented compared to their proportion of the relevant population. The Whitcomb court reversed, holding that lack of proportionality did not prove a constitutional violation absent evidence that the plaintiffs had "less opportunity . . . to participate in the political processes and to elect legislators of their choice." Id. at 149, 91 S. Ct. at 1872. Rather than showing built-in bias which was nothing more than "a mere euphemism for political defeat at the polls," id. at 153, 91 S. Ct. at 1874, the Court concluded that vote dilution under the Fourteenth Amendment required proof of objective factors, such as inability to register or vote, to choose a political party or participate in it, or the lack of access to candidate-slating processes used by political parties. Id. at 149-50, 91 S. Ct. at 1872.

The Supreme Court further expounded on Whitcomb in White v. Regester, 412 U.S. 755, 93 S. Ct. 2332, 37 L. Ed. 2d 314 (1973), a Fourteenth Amendment challenge by black and hispanic voters to two county multi-member districts in Texas. The White court reaffirmed Whitcomb's prohibition on evaluating a constitutional claim solely on the basis of lack of proportionality, stating:

> To sustain such claims, it is not enough that the
> racial group allegedly discriminated against has not
> had legislative seats in proportion to its voting
> potential. The plaintiffs' burden is to produce
> evidence to support findings that the political
> processes leading to nomination and election were not
> equally open to participation by the group in question

> --- that its members had less opportunity than did
> other residents in the district to participate in the
> political processes and to elect legislators of their
> choice.

Id. at 765-66, 93 S. Ct. at 2339.  The Court also approved of a

number of objective factors relied upon by the district court in

its holding that vote dilution had been established:  the history

of official racial discrimination in the state and locality;

majority vote requirements for party primaries, as well as

"place" rules limiting candidates to a specified "place" on the

ballot, which were not improper or invidious but "enhanced the

opportunity for racial discrimination"; the use of candidate-

slating, which further minimized the political influence of the

minority group; the past political success of minority groups;

the lack of responsiveness of a candidate slating group or other

political group to the minority community; the use of overt

racial tactics to defeat the candidates of choice of the minority

community; present socio-economic disparities and cultural or

language barriers that depressed the political participation of

the minority group; and the use of discriminatory devices such as

poll taxes and other restrictive voter registration

procedures.[13]  Id. at 766-69, 93 S. Ct. at 2339-41.  In

addition, the Court noted that the district court had properly

conducted its evaluation of the foregoing factors under the

"totality of the circumstances."  Id. at 769, 93 S. Ct. at 2341.

---

[13] Additional factors were later set forth by the former Fifth
Circuit in Zimmer.  See 485 F.2d at 1305.

Therefore, the White court affirmed the district court's conclusion that the plaintiffs had been "effectively removed" from the political processes of the two challenged districts "in violation of all the Whitcomb standards." Id.

In City of Mobile v. Bolden, 446 U.S. 55, 100 S. Ct. 1490, 64 L. Ed. 2d 47 (1980), the Supreme Court repudiated the use of the results test in section 2 cases. Specifically, the Court made two important holdings. First, the Bolden majority ruled that section 2 was to be interpreted in the same manner as the Fifteenth Amendment. Second, the Bolden court found that "racially discriminatory motivation [the intent test] is a necessary ingredient of a Fifteenth Amendment violation." Id. at 60-62, 100 S. Ct. at 1496-97. Consequently, the Bolden court made it clear that it was the intent test, and not the results test, which was to be applied in section 2 cases.

   **2.   1982 Amendment To Section 2:**

In 1982, Congress responded to Bolden's adoption of the intent test by amending section 2. Congress perceived the intent test to be "inappropriate as the exclusive standard for establishing a violation of section 2" for several reasons. *S. Rep.* at 36, 1982 U.S.C.C.A.N. at 214. First, the Senate Report noted that "the test asks the wrong question." Id. Rather than concentrating on trying to prove discriminatory motivations which existed decades before a particular voting practice, procedure, or structure was adopted or in place, the amendment emphasized that the appropriate inquiry "is whether minorities have equal

15

access to the process of electing their representatives." Id.
Second, the Report indicated that the intent test was
"unnecessarily divisive" because it raised charges of racism
against individual officials or the community as a whole.  Id.
Third, and perhaps most importantly, the intent test made it
"inordinately difficult" for section 2 plaintiffs to prove their
cases.

As a result, Congress renounced the intent test set forth in
Bolden and modified section 2 to read:

> (a)  No voting qualification or prerequisite to
> voting or standard, practice, or procedure shall be
> imposed or applied by any State or political
> subdivision in a manner which results in a denial or
> abridgement of the right of any citizen of the United
> States to vote on account of race or color, or in
> contravention of the guarantees set forth in section
> 1373b(f)(2) of this title, as provided in subsection
> (b) of this section.
>
> (b)  A violation of subsection (a) of this section
> is established if, based on the totality of the
> circumstances, it is shown that the political processes
> leading to nomination or election in the State or
> political subdivision are not equally open to
> participation by members of a class of citizens
> protected by subsection (a) of this section in that its
> members have less opportunity than other members of the
> electorate to participate in the political process and
> to elect representatives of their choice.  The extent
> to which members of a protected class have been elected
> to office in the State or political subdivision is one
> circumstance which may be considered: *Provided*, That
> nothing in this section establishes a right to have
> members of a protected class elected in numbers equal
> to their proportion in the population.

Pub. L. No. 97-205, § 3, 96 Stat. 134 (codified as 42 U.S.C. §
1973 (1982)) (emphasis in original).

Thus, the 1982 amendment had three principle effects.

First, it restored "the legal standards, based on the controlling
Supreme Court precedents, which applied in voting discrimination
claims prior to the litigation involved in Mobile v. Bolden,"
that is, the results test. *S. Rep.* at 2, 1982 U.S.C.C.A.N. at 179.
Second, it added "a new subsection to section 2 which delineates
the legal standards under the results test by codifying the
leading pre-Bolden vote dilution case, White v. Register." Id.
Finally, it also included the "proportional representation
clause" or Dole Amendment to section 2, which "states that the
section does not establish a right to proportional
representation."[14] Id. As a result of the 1982 amendment, a
section 2 plaintiff was provided with the opportunity to prove
discriminatory intent, or, alternatively, "that the challenged
system or practice, in the context of all the circumstances in
the jurisdiction in question, results in minorities being denied
equal access to the political process."[15] Id. at 27, 1982

---

[14]   Senator Dole articulated the purpose behind this clause:

> The language of the subsection explicitly rejects, as did
> White and its progeny, the notion that members of a
> protected class have a right to be elected in numbers
> equal to their proportion of the population.  The extent
> to which members of a protected class have been elected
> under the challenged practice or structure is just one
> factor, among the totality of the circumstances to be
> considered, and is not dispositive.

*S. Report* at 194, 1982 U.S.C.C.A.N. at 364 (additional views of Sen.
Dole).

[15]   But see Johnson v. DeSoto County Bd. of Comm'rs, 72 F.3d
1556, 1563 (11th Cir. 1996) (The language in amended section 2
"expressly requires a showing of discriminatory results, and it
admits of no exception for situations in which there is
discriminatory intent but no discriminatory results."), reh'g and

U.S.C.C.A.N. at 205.

When a plaintiff chooses to proceed under the results test, Congress made it clear that the reviewing court must examine the challenged structure or practice "on the basis of objective factors, rather than making a determination about the motivations which lay behind its adoption or maintenance." Id. Congress derived from White and Zimmer the typical factors which it considered to be relevant to this inquiry:

> 1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;
>
> 2. the extent to which voting in the elections of the state or political subdivision is racially polarized;
>
> 3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;
>
> 4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;
>
> 5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in areas such as education, employment and health, which hinder their ability to participate effectively in the political process;
>
> 6. whether political campaigns have been characterized by overt or subtle racial appeals;

---

suggestion for reh'g en banc denied, 83 F.3d 438; African-Am. Voting Rights Legal Defense Fund, Inc. v. Villa, 54 F.3d 1345, 1357 n.18 (8th Cir. 1995) (same) (collecting citations), cert. denied, ___ U.S. ___, 116 S. Ct. 913, 133 L. Ed. 2d 844 (1996).

> 7.   the extent to which members of the minority group
> have been elected to public office in the jurisdiction.

*S. Rep.* at 28-29, 1982 U.S.C.C.A.N. at 206-07.   The Report further

states that certain additional factors are relevant in some

cases:

> whether there is a significant lack of
> responsiveness on the part of elected officials to the
> particularized needs of the members of the minority
> group.
>
> whether the policy underlying the state or
> political subdivision's use of such voting
> qualification, prerequisite to voting, or standard,
> practice, or procedure is tenuous.
>
> While these enumerated factors will often be the most
> relevant ones, in some cases other factors will also be
> indicative of the alleged dilution.

Id. at 29, 1982 U.S.C.C.A.N. at 207.   The factors are not to be

used in isolation, nor as a "mechanical 'point counting' device,"

but should be examined in a "searching practical evaluation" [Id.

at 30, 1982 U.S.C.C.A.N. at 208] of the totality of the

circumstances "to determine whether the voting strength of

minority voters is . . . minimized or canceled out."   Id. at 29

n.118, 1982 U.S.C.C.A.N. at 207 n.118.

   3.   *Thornburg v. Gingles*:

   In 1986, the Supreme Court addressed for the first time the

impact of the 1982 amendment on section 2 cases.   In Gingles, the

plaintiffs were black registered voters in North Carolina who

challenged one single-member and six multi-member state

legislative districts.   The plaintiffs alleged that their ability

to elect representatives of their choice in the districts was
impaired in violation of section 2 and the Fourteenth and
Fifteenth Amendments.  478 U.S. at 34-35, 106 S. Ct. at 2758.
The district court applied the "totality of the circumstances"
test to the plaintiffs' section 2 claims, and found, primarily on
the basis of the Senate factors, that the districting scheme
resulted in unlawful dilution of black citizens' votes in all of
the challenged districts.  Id. at 37-38, 106 S. Ct. at 2759.  On
appeal, the Supreme Court affirmed with respect to all but one of
the challenged districts, holding that the district court had
otherwise engaged in the proper legal inquiry.  Id. at 42, 61,
80, 106 S. Ct. at 2762, 2772, 2781-82.

Justice Brennan, joined by four justices[16], wrote the
plurality opinion which set out the relevant law.  After
discussing the legislative history behind the amendment to
section 2 [see id. at 43-46, 106 S. Ct. at 2762-64], the Court
described the cornerstone for a vote dilution claim under section
2:  "that a certain electoral law, practice, or structure
interacts with social and historical conditions to cause an
inequality in the opportunities enjoyed by black and white voters
to elect their preferred representatives."  Id. at 47, 106 S. Ct.
at 2764.  However, the Court cautioned that multi-member and at-
large voting schemes alone did not establish a section 2 claim.
Id. at 48, 106 S. Ct. at 2765.  Instead, the Court ruled that a
section 2 plaintiff must first establish certain "necessary

---

[16]   Justices White, Marshall, Blackmun, and Stevens joined.

preconditions" before proving a vote dilution claim:  (1) the
minority group is sufficiently large and geographically compact
to constitute a majority in a single-member district; (2) the
minority group is politically cohesive; and (3) the minority's
preferred candidate is usually defeated by white majority bloc
voting.  Id. at 50-51, 106 S. Ct. at 2766.  The Gingles court
indicated that while "many or all" of the Senate factors "may be
relevant" to a vote dilution claim, unless the three threshold
factors (compactness, cohesiveness, and majority bloc voting)
were also demonstrated, "the use of multimember districts
generally will not impede the ability of minority voters to elect
representatives of their choice."  Id. at 48, 106 S. Ct. at 2765.

The "functional" view of the political process established
by section 2 indicates that the two most important Senate factors
for challenges to multi-member districts are the electoral
success of minority group members in the jurisdiction and
racially polarized voting.  Id. at 48 n.15, 2765 n.15 (quoting S.
Rep. at 28-29, 1982 U.S.C.C.A.N. at 206).  The Gingles court
addressed these factors at great length.

Appellants and the United States had argued that electoral
success from a single election which resulted in proportional, or
near-proportional, representation precluded a section 2 violation
as a matter of law.  Gingles, 478 U.S. at 74-75, 106 S. Ct. at
2778-79.  The Gingles court flatly rejected this argument,
observing that the Senate Report itself states that minority
electoral success does not automatically foreclose a showing of

vote dilution.  Id. at 75, 106 S. Ct. at 2779 (quoting S. Rep. at

29-30, 1982 U.S.C.C.A.N. at 206-07).  In addition, in considering

such success, the Court said that a district court could consider

the circumstances surrounding the electoral victories, including

whether "unusual" political support by white leaders had occurred

as a response to section 2 litigation, or to otherwise circumvent

a possible judicial remedy.  Gingles, 478 U.S. at 75-76, 106 S.

Ct. at 2779-80.  However, the Court also found that the district

court had improperly ignored the significance of sustained

success by black voters in one of the challenged multi-member

districts.  In that particular instance the Gingles court

reversed the district court, holding that "persistent

proportional representation" was "inconsistent" with the

plaintiffs' claim that they did not enjoy an equal opportunity to

elect the representatives of their choice.  Id. at 77, 106 S. Ct.

at 2780 (Brennan, J., joined by White, J.); Id. at 102-05, 106 S.

Ct. at 2793-94 (O'Connor, J., joined by Burger, C.J., Powell, J.,

and Rehnquist, J.).[17]

The Gingles plurality also made several important rulings

designed to assist courts in determining whether racially

polarized voting[18] exists in a challenged district.  The Court

---

[17] Justices Stevens, Marshall, and Blackmun dissented on this
holding, finding that the evidence supported the district court's
judgment that a section 2 violation had occurred in the district in
question.  See Gingles, 478 U.S. at 106-08, 106 S. Ct. at 2795-96
(Stevens, J., concurring in part and dissenting in part).

[18] The Court adopted the definition of "racial polarization"
used by the plaintiffs' expert:  such polarization exists "where
there is 'a consistent relationship between [the] race of the voter

approved of the methodology employed by the district court to
analyze the existence of racial polarization: extreme case
analysis and bivariate ecological regression[19]. See id. at 52-
54, 61, 106 S. Ct. at 2767-68, 2772.  However, the Court also
noted that "the degree of bloc voting which constitutes the
threshold of legal significance will vary from district to
district" depending upon the presence of such factors as the
nature of the allegedly dilutive electoral mechanism, majority

---

and the way in which the voter votes,' or to put it differently,
where 'black voters and white voters vote differently.'"  Gingles,
478 U.S. at 53 n.21, 106 S. Ct. at 2768 n.21.   The Court stated
that the purpose of inquiring into the existence of racially
polarized voting was to determine the second and third
preconditions --- political cohesiveness and majority bloc voting.
Id. at 56, 106 S. Ct. at 2769.

[19]   The Tenth Circuit recently described these methods for
examining voting patterns:

> Bivariate ecological regression analysis "determines the
> degree of relationship between two variables -- here the
> relationship between the racial composition in each
> political unit (the independent variable) and the support
> provided a particular candidate within that political
> unit (the dependent variable)."   In an ecological
> regression analysis, the correlation coefficient shows
> which data points fall on the straight line.   Extreme
> case analysis examines the actual voting percentages
> received by candidates in racially homogenous precincts.
> The inferences that arise from the latter analysis are
> often graphically demonstrated by the former statistical
> method,   the   latter   providing   actual   results   to
> demonstrate the estimates.

Sanchez v. Colorado, 97 F.3d 1303, 1313 (10th Cir. 1996), petition
for cert. filed, ___ U.S.L.W. ___ (U.S. Mar. 13, 1997) (No. 96-
1452) (quoting Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ.,
4 F.3d 1103, 1119 n.10 (3d Cir. 1993), cert. denied, ___ U.S. ___,
114 S. Ct. 2779, 129 L. Ed. 2d 891 (1994)).

vote requirements, prohibitions on bullet voting[20], designated posts[21], the percentage of registered voters who are members of the minority group, and the number of seats open and candidates in the field. Id. at 55-57, 106 S. Ct. at 2769 (internal citations omitted). In addition, the Court found that patterns of bloc voting extending over a period of time would be more probative to a vote dilution claim than the results of a single election. Id. at 57, 106 S. Ct. at 2769-70. The Court cautioned that any "inquiry into the existence of vote dilution caused by submergence in a multimember district" must be "district specific." Id. at 59 n.28, 106 S. Ct. 2771 n.28.[22]

What the Gingles court was unable to resolve is of perhaps the greatest significance to the case *sub judice*. The justices were sharply divided over the types of evidence which could be presented to demonstrate a section 2 claim. The appellants had argued that "the term 'racially polarized voting' must, as a

---

[20] See generally Gingles, 478 U.S. at 38 n.5, 106 S. Ct. at 2760 n.5 ("Bullet (single-shot) voting . . . enables a minority group to win some at-large seats if it concentrates its vote behind a limited number of candidates and if the vote of the majority is divided among a number of candidates.") (citations omitted).

[21] See generally Gingles, 478 U.S. at 39 n.6, 106 S. Ct. at 2760 n.6 ("Designated (or numbered) seat schemes require a candidate for election in multimember districts to run for specific seats, and can, under certain circumstances, frustrate bullet voting.").

[22] See also Gingles, 478 U.S. at 79, 106 S. Ct. at 2781 (Such a determination is "dependent upon the facts of each case" and "requires 'an intensely local appraisal of the design and impact' of the contested electoral mechanisms.") (citations omitted); id. at 101, 106 S. Ct. at 2793 (O'Connor, J., concurring in the judgment) (same).

matter of law, refer to voting patterns for which the principal cause is race." Id. at 61, 106 S. Ct. at 2772.  Consequently, the appellants believed that "only multiple regression analysis, which can take account of other variables which might also explain voters' choices, such as 'party affiliation, age, religion, income, incumbency, education, campaign expenditures, media use measured by cost, . . . name, identification, or distance that a candidate lived from a particular precinct,' can prove that race was the primary determinant of voter behavior." Id. at 61-62, 106 S. Ct. at 2772.

Justice Brennan, joined by Justices Marshall, Blackmun, and Stevens, wrote that racially polarized voting required proof of neither causation nor intent, but instead "refers to a situation where different races . . . vote in blocs for different candidates." Id. at 62, 106 S. Ct. at 2772 (Brennan, J., plurality opinion).[23]  The Justices reasoned that the appellants' theory "would thwart the goals Congress sought to achieve when it amended § 2 and would prevent courts from performing the 'functional' analysis of the political process and the 'searching practical evaluation of the past and present reality' mandated by the Senate Report." Id. at 62-63, 106 S. Ct. at 2772 (Brennan,

---

[23]  Justice White disagreed with this portion of the plurality opinion because he did not believe it was appropriate to draw a distinction between the race of the voter and of the candidate in the identification of racially polarized voting. Gingles, 478 U.S. at 82, 106 S. Ct. at 2783 (White, J., concurring).  Justice O'Connor and three other justices agreed with Justice White on this point.  See id. at 101, 106 S. Ct. at 2792 (O'Connor, J., concurring in the judgment).

J., plurality opinion) (quoting *S. Rep.* at 30, 1982 U.S.C.C.A.N. at 208).  According to Justice Brennan, causation was irrelevant because "[i]t is the difference between the choices made by blacks and whites -- not the reasons for that difference -- that results in blacks having less opportunity than whites to elect their preferred representatives." <u>Gingles</u>, 478 U.S. at 63, 106 S. Ct. at 2773 (Brennan, J., plurality opinion).  The four justices also disapproved of the appellants' argument that section 2 plaintiffs be required to show "voting patterns that are determined primarily by the voter's race, rather than by the voter's other socioeconomic characteristics." <u>Id.</u> at 64-67, 106 S. Ct. at 2773-75 (Brennan, J., plurality opinion).  In addition, they rejected the appellants' assertion that the race of the candidate was relevant to the racial bloc voting analysis. Instead, they found that only the race of the voter could be considered in assessing racially polarized voting patterns.  <u>Id.</u> at 67-70, 106 S. Ct. at 2775-76 (Brennan, J., plurality opinion).

The four justices also emphatically spoke out against requiring an inquiry into the racial motivations of the majority bloc to determine whether racially polarized voting existed. Justice Brennan emphasized that "[a]ppellants' suggestion that the discriminatory intent of individual white voters must be proved in order to make out a § 2 claim must fail for the very reasons Congress rejected the intent test with respect to governmental bodies." <u>Id.</u> at 71, 106 S. Ct. at 2777 (Brennan, J., plurality opinion).  In discussing the use of the phrase "on

account of race" in section 2, the justices opined that

> [t]he Senate Report rejected the argument that the
> words "on account of race" . . . create any requirement
> of purposeful discrimination.  "[I]t is patently
> [clear] that Congress has used the words 'on account of
> race or color' in the Act to mean 'with respect to'
> race or color, *and not to connote any required purpose
> of racial discrimination.*"

Id. at 71 n.34, 106 S. Ct. n.34 (Brennan, J., plurality opinion)

(quoting *S. Rep.* at 27-28, n.109, 1982 U.S.C.C.A.N. at 205)

(emphasis added).  Justice Brennan further observed that the

Bolden intent test had been rejected because it required raising

charges of racism by individual officials or entire communities;

conversely, under the new intent test advocated by the

appellants, "plaintiffs would be required to prove that most of

the white community is racist in order to obtain judicial relief.

It is difficult to imagine a more racially divisive requirement."

Gingles, 478 U.S. at 30, 106 S. Ct. at 2777 (Brennan, J.,

plurality opinion).  Moreover, the four justices were concerned

that the test advocated by the appellants would be "equally, if

not more, burdensome" than the Bolden intent test, imposing

prohibitive costs and requiring use of a multiple regression

equation that "would be all but impossible for a social scientist

to operationalize."  Id. at 72-73, 106 S. Ct. at 2777-78

(Brennan, J., plurality opinion).  Finally, Justice Brennan

concluded that "[f]ocusing on the discriminatory intent of the

voters, rather than the behavior of the voters" asks the wrong

question because "[a]ll that matters under § 2 and under a

functional theory of vote dilution is voter behavior, not its
explanations." Id. at 73, 106 S. Ct. at 2778 (Brennan, J.,
plurality opinion).

Justice O'Connor, joined by three other Justices[24],
concurred in the judgment, but took strong exception to both the
test adopted by a majority of the Court, as well as Justice
Brennan's plurality opinion on the type of evidence which could
be used to prove racial polarization.[25]   Justice O'Connor first
expressed concern that the Court's threshold test would
effectively create the "right to usual, roughly proportional
representation on the part of sizable, compact, cohesive minority
groups," with "no reference to most of the 'Zimmer factors' that
were developed by the Fifth Circuit to implement White's results
test and which were highlighted in the Senate Report." Id. at
91-92, 106 S. Ct. at 2787-88 (O'Connor, J., concurring in the
judgment). In its stead, Justice O'Connor would follow the
approach in Whitcomb and White, requiring that a court "consider
all relevant factors bearing on whether the minority group has

---

[24]   Chief Justice Burger, and Justices Powell and Rehnquist
joined.

[25]   Notwithstanding these differences, Justice O'Connor joined
with the majority in finding that six of the seven challenged
districts violated section 2. In reaching this conclusion, Justice
O'Connor disagreed with the appellants' characterization of the
district court's order as requiring a finding of unlawful vote
dilution solely on the basis of lack of proportionality. Instead,
Justice O'Connor reasoned that, with the exception of one district,
the district court had properly considered the plaintiffs' section
2 claims in light of the Senate factors and under the totality of
the circumstances. See Gingles, 478 U.S. at 94-96, 103-05, 106 S.
Ct. at 2789-90, 2793-94 (O'Connor, concurring in the judgment).

'less opportunity than other members of the electorate to participate in the political process *and* to elect representatives of their choice.'" Id. at 99, 106 S. Ct. at 2791 (O'Connor, J., concurring in the judgment) (quoting 42 U.S.C. § 1973) (emphasis in original).

Responding to Justice Brennan's plurality opinion on the evidence needed to sustain a showing of racial polarization, Justice O'Connor wrote:

> Insofar as statistical evidence of divergent racial voting patterns is admitted solely to establish that the minority group is politically cohesive and to assess its prospects for electoral success, I agree that defendants cannot rebut this showing by offering evidence that divergent racial voting patterns may be explained in part by causes other than race, such as an underlying divergence in the interests of minority and white voters.  I do not agree, however, that such evidence can never affect the overall dilution inquiry. Evidence that a candidate preferred by the minority group in a particular election was rejected by white voters for reasons other than those which made that candidate the preferred choice of the minority group would seem clearly relevant in answering the question whether bloc voting by white voters will consistently defeat minority candidates.  Such evidence would suggest that another candidate, equally preferred by the minority group, might be able to attract greater white support in future elections . . . . The overall vote dilution inquiry neither requires nor permits an arbitrary rule against consideration of all evidence concerning voting preferences other than statistical evidence of racial voting patterns.  Such a rule would give no effect whatever to the Senate Report's repeated emphasis on "intensive racial politics," on "racial political considerations," and on whether "racial politics . . . dominate the electoral process" as one aspect of the "racial bloc voting" that Congress deemed relevant to showing a § 2 violation.

Id. at 100, 106 S. Ct. at 2792 (O'Connor, J., concurring in the judgment) (quoting *S. Rep*. at 33-34, 1982 U.S.C.C.A.N. at 211-12).

In addition, Justice O'Connor stated that evidence of consistent and virtually proportional minority electoral success also should be entered into the vote dilution calculus. She reasoned that while such evidence would not always bar a section 2 claim as a matter of law, it "is entitled to great weight in evaluating whether a challenged electoral mechanism has, on the totality of the circumstances, operated to deny black voters an equal opportunity to participate in the political process and to elect representatives of their choice." Gingles, 478 U.S. at 104, 106 S. Ct. at 2794 (O'Connor, J., concurring in the judgment). Justice O'Connor concluded by opining that any evaluation of vote dilution required "consideration of the minority group's access to the political processes generally, not solely consideration of the chances that its preferred candidates will actually be elected." Id. at 105, 106 S. Ct. at 2794-95 (O'Connor, J., concurring in the judgment).

As the foregoing discussion makes clear, while Gingles clarified many of the standards to be applied to section 2 vote dilution claims, it also left unresolved a large number of important evidentiary issues.

### 4. *Johnson v. DeGrandy:*

In Johnson v. DeGrandy, ___ U.S. ___, 114 S. Ct. 2647, 129 L. Ed. 2d 775 (1994), the Supreme Court had occasion to revisit the analytical framework for section 2 claims established by the Court in Gingles. DeGrandy involved a section 2 challenge brought by hispanic and black voters to a state legislative

districting plan in Florida. The <u>DeGrandy</u> plaintiffs claimed
that the plan diluted minority voting strength by not drawing
more single-member state House and Senate districts where
minority groups formed a majority of the voting population. <u>Id.</u>
at ___, 114 S. Ct. at 2652. The district court agreed in part
with the plaintiffs, finding that the plan's provisions for state
House districts violated section 2 because additional reasonably
compact minority districts could be drawn. Conversely, the
district court found that the state Senate districts did not
violate section 2 because an additional majority-hispanic
district could only be drawn at the expense of black voters in
the area. <u>Id.</u> at ___, 114 S. Ct. at 2652-53. On appeal, the
Supreme Court affirmed the district court's holding with respect
to the state Senate districts, but reversed as to the state House
districts.[26] <u>Id.</u> at ___, 114 S. Ct. at 2663.

In an opinion written by Justice Souter, the <u>DeGrandy</u> court
outlined the requirements for establishing a vote dilution claim
under section 2. As an initial matter, the Court reaffirmed that
the three <u>Gingles</u> factors, compactness, cohesiveness, and
majority bloc voting, were "'necessary preconditions' for
establishing vote dilution by use of a multimember district."
<u>DeGrandy</u>, ___ U.S. at ___, 114 S. Ct. at 2657 (quoting <u>Gingles</u>,

_____

[26] Applying the appropriate standards, as discussed in the
remainder of this section, the <u>DeGrandy</u> court concluded that the
district court had erred by incorrectly misconstruing section 2 as
equating "dilution with failure to maximize the number of
reasonably compact majority-minority districts." <u>DeGrandy</u>, ___
U.S. at ___, 114 S. Ct. at 2662.

478 U.S. at 50, 106 S. Ct. at 2766).  However, the Court also

indicated that proof of the Gingles factors was not necessarily

sufficient to establish liability under section 2:

> But if Gingles so clearly identified the three as
> generally necessary to prove a § 2 claim, it just as
> clearly declined to hold them sufficient in
> combination, either in the sense that a court's
> examination of relevant circumstances was complete once
> the three factors were found to exist, or in the sense
> that the three in combination necessarily and in all
> circumstances demonstrated dilution.  This was true not
> only because bloc voting was a matter of degree, with a
> variable legal significance depending on other facts,
> but also because the ultimate conclusions about
> equality or inequality of opportunity were intended by
> Congress to be judgments resting on comprehensive, not
> limited, canvassing of relevant facts.  Lack of
> electoral success is evidence of vote dilution, but
> courts must also examine other evidence in the totality
> of the circumstances, including the extent of the
> opportunities minority voters enjoy to participate in
> the political processes.  To be sure, some § 2
> plaintiffs may have easy cases, but although lack of
> political opportunity may be readily imagined and
> unsurprising when demonstrated under circumstances that
> include the three essential Gingles factors, that
> conclusion must still be addressed explicitly, and
> without isolating any other arguably relevant facts
> from the act of judgment.

DeGrandy, ___ U.S. at ___, 114 S. Ct. at 2657 (internal citations

omitted).  As the Court further noted, the ultimate focus of an

inquiry into a section 2 vote dilution claim is whether, under

the totality of the circumstances, the challenged electoral

scheme denies minority voters "equal political opportunity."  Id.

at ___, 114 S. Ct. at 2658.[27]

_____

[27]  Cf. 42 U.S.C. § 1973(b) (vote dilution shown where, under
the totality of the circumstances, members of a minority group
"have less opportunity than other members of the electorate to
participate in the political process and to elect representatives

The DeGrandy court also introduced a new factor to be considered under the totality of the circumstances: proportionality.  According to the Court, proportionality is the relationship between "the number of majority-minority voting districts to minority members' share of the relevant population."[28]  Id. at ___ n.11, 114 S. Ct. at 2658 n.11; id. at ___, 114 S. Ct. at 2664 (O'Connor, J., concurring).  The Court held that "[w]hile such proportionality is not dispositive in a challenge to single-member districting, it is a relevant fact in the totality of the circumstances to be analyzed" when determining equality of political opportunity.  DeGrandy, ___ U.S. at ___, 114 S. Ct. at 2651; id. at ___, 114 S. Ct. at 2664 (O'Connor, J., concurring); id. at ___, 114 S. Ct. at 2665 (Kennedy, J., concurring in part and in the judgment).

In sum, DeGrandy further illuminated the section 2 analysis set forth in Gingles.  DeGrandy held that even with the establishment of compactness, cohesiveness, and majority bloc voting, a district court must still review all relevant facts --- including evidence pertaining to the Senate factors and proportionality.  If the totality of the circumstances demonstrates that the minority group has equal opportunity to participate in the political process, then there can be no

_____

of their choice.").

[28]     The  Court  distinguished  its  definition  from  the proportionate representation clause contained in section 2, noting that the clause "speaks to the success of minority candidates," and not  to  "the  political  or  electoral  power  of  minority  voters." DeGrandy, ___ U.S. at ___ n.11, 114 S. Ct. at 2658 n.11.

liability under section 2.

B.    **The Eleventh Circuit's Interpretation Of Section 2:**

The reemergence of the results test as an appropriate framework for evaluating claims of unlawful vote dilution, set into motion a dialogue which has effectively divided the Eleventh Circuit.  In Solomon, the Eleventh Circuit split over two principal issues:  first, the legal effect of establishing the three Gingles factors; and second, the role, if any, that racial bias in the community has in the examination of a section 2 claim under the totality of the circumstances.  In Nipper, the circuit judges sharpened their focus on the second question.  This section will briefly summarize the dialogue between the judges.

1.    **The dialogue begins in *Solomon*:**

Review of this cause by the Eleventh Circuit resulted in an en banc panel unanimously concluding that the Court had applied the wrong legal standard when the Court entered judgment for defendants.  The Eleventh Circuit found that the plaintiffs had satisfied the three Gingles factors.  However, the judges remained "divided on the legal effect of proving those factors." Solomon, 899 F.2d at 1013.

Judge Kravitch, writing a specially concurring opinion in which Judges Johnson, Hatchett, Anderson, and Clark joined, found that while "a district court may consider the totality of the circumstances, those circumstances must be examined for the light they shed on the existence of the three core Gingles factors." As a result, Judge Kravitch concluded that proof of the Gingles

factors was "both necessary and, in this case, sufficient for a section 2 vote dilution claim." Id. at 1017 (Kravitch, J., specially concurring). See also id. at 1016 n.3 (Kravitch, J., specially concurring) ("While Gingles made clear that proof of the three core factors can be sufficient to establish a § 2 vote dilution claim, plaintiffs in this case also adduced strong evidence establishing the other supportive factors."); id. at 1021 (Kravitch, J., specially concurring) ("Having reviewed the uncontroverted evidence below, I conclude that appellants have met all three Gingles requirements. This is all the Supreme Court requires, and I may require no more.").

Conversely, Judge Tjoflat, writing a specially concurring opinion in which Judges Fay, Edmondson, Cox, and Hill joined, believed that the totality of the circumstances in Gingles required more than an inquiry into the three factors of compactness, cohesiveness, and majority bloc voting.[29] Judge Tjoflat opined that "a section 2 plaintiff does not necessarily win by proving the three Gingles factors." Instead, he reasoned, "[s]ection 2, its legislative history, and Gingles itself all call for a more searching and flexible inquiry into the totality of the circumstances surrounding the voting system . . ." Solomon, 899 F.2d at 1022 (Tjoflat, C.J., specially concurring).

---

[29] Judge Tjoflat found that if Judge Kravitch's approach was designed to limit the section 2 inquiry to the three Gingles factors, then "she would create a right to proportional representation for all large, compact, and cohesive minority groups --- a result explicitly forbidden by section 2." Solomon, 899 F.2d at 1022 (Tjoflat, C.J., specially concurring). See also id. at 1033, 1035-36 & n.13 (Tjoflat, C.J., specially concurring) (same).

Part of the inquiry envisioned by Judge Tjoflat could encompass evidence submitted by a section 2 defendant "affirmatively show[ing], under the totality of the circumstances, that the community is not motivated by racial bias in its voting."  Id.  Judge Tjoflat engaged in an extensive discussion of case law and the legislative history of the 1982 amendment to explain why he believed racial bias played such a decisive role in examining a section 2 claim.  He found that

> amended section 2 was intended to restore the invidious discrimination requirement as articulated by the Whitcomb and White courts: a plaintiff must prove either (1) the subjective discriminatory motive of the legislators or officials, or (2) the existence of objective factors, showing that the electoral scheme interacted with racial bias in the community and allowed that bias to dilute the minorities' voting strength.

Id. at 1029 (Tjoflat, C.J., specially concurring).  He further interpreted the Senate Report's use of the phrase "discriminatory result" as requiring interaction between "a suspect scheme and racial bias in the voting community."  Id. at 1032 (Tjoflat, C.J., specially concurring) (quoting S. Rep. at 22, 28, 1982 U.S.C.C.A.N. at 200, 206).  Stated another way, "[i]f only the suspect scheme is present, without bias in the community, the scheme cannot, by definition, result in classifications, decisions, or practices based on race or color."  Solomon, 899 F.2d at 1032 (Tjoflat, C.J., specially concurring).

Judge Tjoflat concluded by summarizing his construction of the proper analytical framework for section 2 cases after

Gingles.  First, where the plaintiff cannot prove the three
Gingles factors, then the defendant prevails.  Second, where the
plaintiff proves the Gingles factors, thereby creating an
inference of racial discrimination within the voting community,
three scenarios are possible.  If the defendant offers nothing in
rebuttal, then the plaintiff wins.  If the defendant "offers
proof of other objective factors in rebuttal, the court must be
satisfied, before it may rule in favor of the plaintiff, that,
under the totality of the circumstances, the minority group is
denied meaningful access to the political process 'on account of
race or color.'"  Solomon, 899 F.2d at 1035 (Tjoflat, C.J.,
specially concurring).  However, if the defendant can show
"evidence of objective factors that, under the totality of the
circumstances, indicate that the voting community is not driven
by racial bias," then the plaintiff cannot prevail.  Id.  Judge
Tjoflat believed that this framework made the burden of proof
"just right."  Id. at 1037 (Tjoflat, C.J., specially concurring).

Judge Kravitch took strong exception to Judge Tjoflat's
approach.  According to Judge Kravitch, Gingles stood for the
proposition that the only question in assessing vote dilution

> "is whether as a result of the challenged practice or
> structure plaintiffs do not have an equal opportunity
> to participate in the political processes and to elect
> candidates of their choice."  Thus, if plaintiffs are
> able to establish that the challenged electoral
> practice has the effect of diluting minority voting
> strength, defendants cannot argue as an affirmative
> defense that the practice was adopted or maintained for
> a nondiscriminatory reason.

37

Id. at 1016 (Kravitch, J., specially concurring) (quoting
Gingles, 478 U.S. at 44, 106 S. Ct. at 2762-63). In sharp
contrast to Gingles' admonition, Judge Kravitch believed that
Judge Tjoflat's method would reintroduce intent and bias into
section 2 cases. Quoting much of the same language from the
Senate Report which was used by Justice Brennan in Gingles[30],
Judge Kravitch surmised that evidence of racial bias "would
involve litigating the issue of whether or not the community as a
whole was motivated by racism, a divisive inquiry that Congress
sought to avoid by instituting the results test." Solomon, 899
F.2d at 1016 n.3 (Kravitch, J., specially concurring). Even if
racial bias was required to be examined under the results test,
Judge Kravitch noted that "a division on racial lines, as
exemplified in voting patterns, is striking evidence of a
racially divided community, and . . . a fairly persuasive
indicator of a community driven by racial bias." Id. However,
Judge Kravitch expressly declined to accept Judge Tjoflat's
suggestion that racial bias had a place in the results test
analysis of a vote dilution claim brought under section 2.

    2.    **The dialogue continues in *Nipper*:**

Judge Tjoflat observed in Nipper that DeGrandy cleared up
the first question which divided the Eleventh Circuit in Solomon:
namely, the legal effect of establishing the three Gingles

---

[30]    By comparison, Judge Kravitch pointed out that Judge
Tjoflat's analysis was similar to Justice O'Connor's concurring
opinion in Gingles, which "failed to obtain the support of a
majority of the Court." Solomon, 899 F.2d at 1016 n.3 (Kravitch,
J., specially concurring).

factors.  *See* *Nipper*, 39 F.3d at 1513-14 (Tjoflat, C.J., joined
by one judge).  The Court agrees with this assessment.  As
discussed in Section I(A)(4), *supra*, the *DeGrandy* court held that
the *Gingles* factors are necessary preconditions to a section 2
claim.  Establishment of the preconditions does not obviate the
requirement that a district court review under the totality of
the circumstances all of the relevant facts pertaining to a vote
dilution challenge.  Hence, it is unsurprising that after
*DeGrandy*, four of the Eleventh Circuit judges in *Nipper* shifted
their gaze towards the one unresolved issue from *Solomon*: the
role that racial bias plays in the vote dilution inquiry.[31]

   Writing for himself and Judge Anderson, Judge Tjoflat
reiterated his belief that racial bias plays a crucial role in
the section 2 analysis.  Judge Tjoflat interpreted section 2's
prohibition of voting structures which result in unequal voting
opportunity "on account of race or color" as "explicitly
retain[ing] racial bias as the gravamen of a vote dilution
claim."  *Nipper*, 39 F.3d at 1515 (Tjoflat, C.J., joined by one
judge).  Judge Tjoflat reasoned that the decision to include the
"on account of race or color" language was "not so much the
product of legislative discretion as constitutional imperative,
given that the scope of Congress' remedial power under the Civil
War Amendments is defined in large part by the wrongs they

---

[31]   The remaining four judges on the en banc panel (three
judges recused themselves) joined Judge Edmondson in an opinion
concurring in part and in the result of Judge Tjoflat's plurality
opinion.

prohibit." Id. at 1516 (quoting League of United Latin Am. Citizens, Council No. 4434 v. Clements ("LULAC"), 999 F.2d 831, 854 (5th Cir. 1993) (en banc), cert. denied, ___ U.S. ___, 114 S.Ct. 878, 127 L.Ed.2d 74 (1994)). Moreover, he believed that ignoring the "on account of race" language by failing to allow an inquiry into racial bias within the subject voting community, would "create a de facto right to proportional representation, a result explicitly prohibited by section 2 itself." Nipper, 39 F.3d at 1516-17 (Tjoflat, C.J., joined by one judge).

Judge Tjoflat then engaged in an extensive analysis of the legislative history of the 1982 amendment to explain why "racial bias in the voting community remains the keystone of section 2 vote dilution claims."[32]  Id. at 1517.  He repeated his contention that the 1982 amendment retained the requirement from Whitcomb and White that a plaintiff "must prove invidious discrimination in order to establish a violation of section 2." Id. at 1524.  Addressing concerns raised by the Department of Justice that such a reading amounted to a reintroduction of the Bolden intent test, Judge Tjoflat drew a distinction between examining the racial motivations of lawmakers and a more general inquiry into racial bias within the voting community. See id. at 1520-24.  He read certain language contained in the Senate Report

---

[32]  Much of Judge Tjoflat's analysis in Nipper of section 2's legislative history mirrored his earlier analysis in Solomon. Compare Nipper, 39 F.3d at 1517-24 (Tjoflat, C.J., plurality opinion) with Solomon, 899 F.2d at 1022-35 (Tjoflat, C.J., specially concurring).  See also discussion of Judge Tjoflat's opinion in Solomon contained in Section I(B)(1), supra.

Nipper, 39 F.3d at 1525 (Tjoflat, C.J., joined by one judge)
(quoting LULAC, 999 F.2d at 853-54). However, the LULAC court
had also expressed concern that conditioning section 2 relief
upon proof of racial bias in the voting community would require
plaintiffs to "establish the absence of all . . . potentially
innocent explanations for white voters' rejection of minority-
preferred candidates." 999 F.2d at 859. Judge Tjoflat
confronted this problem by indicating that a section 2 plaintiff
would not have to "prove the negative." Instead, "proof of the
second and third Gingles factors [cohesiveness and majority bloc
voting] will ordinarily create a sufficient inference that racial
bias is at work." Nipper, 39 F.3d at 1525 & n.64 (Tjoflat, C.J.,
joined by one judge). A defendant would then be allowed to
"rebut proof of vote dilution by showing [under the totality of
the circumstances] that losses by minority-preferred candidates
are attributable to non-racial causes." Id. at 1526.

Judge Hatchett, joined by Judge Kravitch in his dissent,
wrote the rejoinder to Judge Tjoflat's opinion. Judge Hatchett
opined that despite Judge Tjoflat's "searching effort, absolutely
no authority exists in either the case law, the legislative
history, or the language of the Act" to support the imposition of
a racial bias inquiry. Nipper, 39 F.3d at 1548 (Hatchett, J.,
dissenting). Specifically, Judge Hatchett found that "Congress
and the Supreme Court have never required as a threshold issue an
inquiry into the private motivations of individual voters to
substantiate a vote dilution claim." Id. Rather, "the proper

focus of a voting rights challenge has always been whether the state, intentionally or otherwise, maintained an electoral system that disadvantages minorities on account of race."  Id.

Judge Hatchett examined at great length the development of section 2.  He first found that the Supreme Court did not interpret the Fourteenth and Fifteenth Amendments as "regulat[ing] the conduct of private individuals in elections for state officers."  Id. (collecting citations).  Instead, "[t]he racial bias inquiry was only relevant to demonstrate the intent of the legislature in utilizing a particular electoral system that disadvantaged racial minorities."  Id. at 1549.  Thus, when Congress enacted the Voting Rights Act, it tailored section 2 "to fit within the constitutional confines of its ability to regulate state action rather than the activity of private individuals." Id.

Similarly, Judge Hatchett did not read the pre-Bolden cases as requiring an inquiry into racial bias under the results test. He found that the objective evidence discussed in Whitcomb, White, and Zimmer helped a plaintiff demonstrate "disparate impact" of vote dilution by showing that the challenged election scheme or practice provided minorities with "less opportunity . . . to participate in the political process and elect legislators of their choice."  Nipper, 39 F.3d at 1550 (Hatchett, J., dissenting) (quoting Whitcomb, 403 U.S. at 149, 91 S. Ct. at 1872).  The objective factors themselves were seen by Judge Hatchett as "concern[ing] the activities of state and quasi-state

43

officials[33] in employing various devices to obstruct the ability
of racial minorities to elect candidates of their choice."
Nipper, 39 F.3d at 1550-51 (Hatchett, J., dissenting).
Consequently, Judge Hatchett concluded that "[t]he pre-Bolden era
did not proscribe individual voter racial discrimination;
instead, it proscribed the machinations of state officials that
intentionally or effectively presented a racial bar to the
ability of minorities to elect their favored candidates."  Id. at
1551.

     According to Judge Hatchett, the 1982 amendment to section 2
marked a return to the pre-Bolden results test, without an
accompanying requirement "to inquire into the racial biases of
individual voters."  Nipper, 39 F.3d at 1552 (Hatchett, J.,
dissenting).  As an initial matter, Judge Hatchett flatly
rejected Judge Tjoflat's construction of the "on account of race"
language.  Judge Hatchett pointed out that the Senate Report had
expressly defined this language to mean "'with respect to' race
or color," making it clear that "'race' rather than some other
factor must be the identifiable impediment to the minority
group's electoral success" --- without "imply[ing] any reference
to purposeful racial discrimination."  Id. at 1552-53 (quoting S.
Rep. at 27-28 n.109, 1982 U.S.C.C.A.N. at 205-06 n.109).  He did
not find that this interpretation would be inconsistent with the

---

[33]  For example, Judge Hatchett pointed out that one of the
factors, use of racial appeals in campaigns, concerned actions by
political parties --- which have been deemed to be "quasi-state
officials."  Nipper, 39 F.3d at 1550-51 & nn. 4-5 (Hatchett, J.,
dissenting) (collecting citations).

language in the Act prohibiting proportional representation,
since the results test only "guarantees protection from vote
dilution due to racial bloc voting." Nipper, 39 F.3d at 1552
(Hatchett, J., dissenting).  To the extent that Judge Tjoflat
read the 1982 amendment as a proscription against invidious
discrimination, or to otherwise mandate an inquiry into the
racial bias of the community, Judge Hatchett conveyed the view
that the language of the Act neither explicitly nor implicitly
supported such a construction.  Id. at 1552-54.  In fact, Judge
Hatchett observed that the Senate Report had cautioned against
exploring racial motivations within the voting community as
"exceedingly divisive." Id. at 1554 (citing S. Rep. at 36, 1982
U.S.C.C.A.N. at 214).  If such an inquiry were required, section 2
plaintiffs meeting the Gingles factors "will rarely be permitted
to elect representatives of their choice when serious racially
polarized voting exists." Nipper, 39 F.3d at 1556 (Hatchett, J.,
dissenting).

## C.   A Model Framework For § 2 Vote Dilution Challenges:

The discussion above sets out in detail the genesis of the
results test for analyzing vote dilution claims brought under
section 2 of the Voting Rights Act.  In addition, it summarizes
the effect of the two most important Supreme Court decisions,
Gingles and DeGrandy, on the vote dilution inquiry.  Finally, it
includes the Eleventh Circuit's competing interpretations of the

role, if any, that racial bias[34] has under the results test. However, what the discussion fails to include is of the greatest import to the case *sub judice*:  an analytical framework within which this Court may fulfill its mandate from the Eleventh Circuit.

Consequently, the Court is now in the position when it must determine whether the balance of evidence supports the establishment of unlawful vote dilution in this case.  In order to accomplish this task, the Court will provide what it believes to be the proper answer to the racial bias conundrum.  It will then be necessary to summarize the proper test to use in analyzing vote dilution claims, in light of all the relevant case law and the legislative history to the 1982 amendment to section 2.

### 1.   Resolving The Racial Bias Dilemma:

Justice O'Connor wrote in <u>Gingles</u> that there "is an inherent tension between what Congress wished to do and what it wished to avoid" in amending section 2 of the Voting Rights Act.  478 U.S. at 84, 106 S. Ct. at 1784 (O'Connor, J., concurring in the judgment).  On the one hand, Congress wanted to devise a method

---

[34]   "Racial bias," as referenced in the remainder of this section, refers to whether the voting community is "motivated . . . to exclude a minority group from participation in the political process."  <u>Solomon</u>, 899 F.2d at 1022 (Tjoflat, C.J., specially concurring).  <u>See also</u> <u>Jones v. City of Lubbock</u>, 730 F.2d 233, 234 (5th Cir. 1984) (Higginbotham, J., specially concurring) (asserting that the racial bloc voting inquiry "is whether race or ethnicity was such a determinant of voting preference in the rejection of black or brown candidates by a white majority that the at-large district, with its components, denied minority voters effective voting opportunity").

to ensure equal access to the political process for blacks and other racial and ethnic minorities, without placing an "inordinately difficult burden" (such as the intent test) on section 2 plaintiffs. *S. Rep.* at 36, 1982 U.S.C.C.A.N. at 214. On the other hand, Congress did not want to permit a vote dilution claim to be established by merely requiring that a racial or ethnic minority group prove "the conjunction of an allegedly dilutive electoral mechanism and the lack of proportional representation." <u>Gingles</u>, 478 U.S. at 46, 106 S. Ct. at 2764 (Brennan, J., plurality opinion) (citing *S. Rep.* at 16, 1982 U.S.C.C.A.N. at 193-94). <u>See</u> <u>also</u> 42 U.S.C. § 1973(b) ("nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population"). It is this tension, and the often contradictory and ambiguous language contained in the Senate Report accompanying the 1982 amendment, which has engendered the widespread confusion and debate in the courts over the proper role of racial bias in the vote dilution inquiry.

> **a.   The presence of racial bias is not necessary to establish vote dilution under the results test:**

After giving due consideration to the opinions expressed in <u>Solomon</u> and <u>Nipper</u>, the Court submits that the presence or absence of racial bias within the voting community is not dispositive of whether liability has been established under section 2. There are several reasons for this conclusion. The Court believes that a proper reading of the Senate Report reveals that Congress did not want to impose upon section 2 plaintiffs

47

the burdensome requirement of proving racial bias or negating the absence of racial bias within the voting community.[35]   In addition, proving racial bias would present a number of evidentiary problems.   Furthermore, recent case law suggests that no single piece of evidence is dispositive proof of a vote dilution claim --- the ultimate inquiry must remain whether "a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives."   Gingles, 478 U.S. at 47, 106 S. Ct. at 2764.   Diverting all attention to whether or not the voting community is presently driven by racial bias would also ignore one important fact: present socio-economic effects of past discrimination often interact with a voting structure or practice in a manner which results in a minority group having unequal access to the political process, even where the community itself is not motivated by racial bias in its voting.

Preliminarily, the Court adopts Judge Hatchett's reading of the "on account of race or color" language contained in section 2:   "The phrase merely emphasizes that 'race' rather than some

---

[35]   "Indications of congressional intent in a conference committee report deserve great deference by courts because 'the conference report represents the final statement of terms agreed to by both houses, [and] next to the statute itself it is the most persuasive evidence of congressional intent.'"   RJR Nabisco, Inc. v. United States, 955 F.2d 1457, 1462 (11th Cir. 1992) (quoting Demby v. Schweiker, 671 F.2d 507, 510 (D.C. Cir. 1981)).   Moreover, as this opinion's extensive discussion makes clear, courts have generally relied upon the Senate Report accompanying the 1982 amendment to section 2 to determine the proper legal framework for proving unlawful vote dilution.

other factor must be the identifiable impediment to the minority group's electoral success." Nipper, 39 F.3d at 1552 (Hatchett, J., dissenting).  The plain language of the Senate Report renders this conclusion inescapable:

> During the Committee deliberations, opponents of the results test argued that the reported bill is inconsistent with the results standard because Section 2, as amended, still contains the phrase "a denial or abridgment [of the right to vote] on account of race or color."  The argument is that the words "on account of" themselves create a requirement of purposeful discrimination.  This claim overlooks the present structure of the Voting Rights Act, which completely refutes it.  Section 5 of the present Act requires the Attorney General or the district court to disapprove a proposed voting change unless the submitting jurisdiction establishes that it "does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color. . ."  Thus, it is patently [clear] that Congress has used the words "on account of race or color" in the Act to mean "with respect to" race or color, and not to connote any required purpose of racial discrimination. Any other arguments based on similar parsing of isolated words in the bill, that there is some implied "purpose" component in Section 2, even when plaintiffs proceed under the results standard, are equally misplaced and incorrect.

S. Rep. at 27-28 n.109, 1982 U.S.C.C.A.N. at 205-06 n.109.  See also Nipper, 39 F.3d at 1552-53 (Hatchett, J., dissenting) (quoting same).  This is one of those rare occasions when, notwithstanding the other ambiguities contained in the Senate Report, Congress could not have made its intent any clearer.  It is unnecessary to establish that vote dilution has occurred as a result of purposeful racial discrimination within the voting

49

community.[36]  Furthermore, as will become more obvious with
additional discussion, Judge Hatchett was also correct in his
conclusion that interpreting the "on account of race" language in
this manner does not establish a right to proportional
representation.  See Nipper, 39 F.3d at 1552 (Hatchett, J.,
dissenting).

In a similar vein, the Court declines to accept Judge
Tjoflat's reliance on the Senate Report's adoption of the results
test as articulated in White v. Regester[37] and use of
"discriminatory result" and other similar phrases, as somehow
requiring a showing of "invidious discrimination" or "racial
bias" within the voting community.  See Nipper, 39 F.3d at 1517-
20 (Tjoflat, C.J., joined by one judge); Solomon, 899 F.2d at
1028-32 (Tjoflat, C.J., specially concurring).  The preceding
paragraph describes in detail that in its adoption of the results
test, Congress did not intend to impose a showing of purposeful
discrimination --- even where "isolated words" in the 1982

---

[36]  Other courts have reached the opposite conclusion.  See,
e.g., Uno v. City of Holyoke, 72 F.3d 973, 981 (1st Cir. 1995);
LULAC, 999 F.2d at 850; Reed v. Town of Babylon, 914 F. Supp. 843,
875-78 (E.D.N.Y. 1996).  Cf. Nipper, 39 F.3d at 1515-17 (Tjoflat,
C.J., plurality opinion) ("On account of race" language "explicitly
retains racial bias as the gravamen of a vote dilution claim").
However, these decisions are not binding upon this Court.
Moreover, to the extent that the interpretation set forth in these
decisions is inconsistent with the express legislative intent of
Congress, the Court would be remiss in its duty to faithfully
follow the law if it were to adopt it.

[37]  See, e.g., S. Rep. at 2, 15-16, 32, 1982 U.S.C.C.A.N. at 179,
192-94, 210.

amendment and Senate Report seem to be to the contrary.[38]
Indeed, it is logically inconsistent to say that a court
evaluating a section 2 claim challenging a voting practice or
structure does not have to inquire into the "motivations which
lay behind its adoption or maintenance" [*S. Rep.* at 27, 1982
U.S.C.C.A.N. at 205] because of its "divisiveness" [*S. Rep.* at 36,
1982 U.S.C.C.A.N. at 214], but must engage in an even more divisive
analysis of motivations of "individual . . . citizens" [*id.*].   In
reading the language contained in the Senate Report, it is
important to remember the maxim *Verba intentioni, non e contra,
debent inservire,* that is, "Words are to be subservient to the
intent, not the intent to the words."   Furthermore, although the
Senate Report makes repeated references to <u>Whitcomb</u>[39] and <u>White</u>,
no where does it state that a section 2 plaintiff must

---

[38]   In fact, the Senate Report itself puts to rest any notion
that purposeful discrimination within the voting community must be
demonstrated to establish a claim under section 2.   <u>See</u> generally
*S. Rep.* at 16, 1982 U.S.C.C.A.N. at 193 ("In our view, proof of
discriminatory purpose should not be a prerequisite to establishing
a violation of Section 2 of the Voting Rights Act.   Therefore, the
Committee has amended Section 2 to permit plaintiffs to prove
violations by showing that minority voters were denied an equal
chance to participate in the political process, i.e., by meeting
the [pre]-*Bolden* test.").

[39]   <u>Whitcomb</u> has also been cited by some judges as supporting
the adoption of a racial bias requirement into section 2.   <u>See</u> <u>Uno</u>,
72 F.3d at 982; <u>Nipper</u>, 39 F.3d at 1518 (Tjoflat, C.J., joined by
one judge); <u>Solomon</u>, 899 F.2d at 1023-26 (Tjoflat, C.J., specially
concurring); <u>Reed</u>, 914 F. Supp. at 874-75.   It is important not to
read too much into the <u>Whitcomb</u> holding.   As Judge King pointed out
in <u>LULAC</u>, "*Whitcomb* [merely] stands for the proposition that where
there is evidence of partisan voting or interest group politics *and
no evidence* that members of the minority group have an unequal
opportunity to participate in the political process on account of
race or color, the minority group's vote dilution claim will fail."
999 F.2d at 907 (King, J., dissenting) (emphasis in original).

demonstrate "invidious discrimination" to prove vote dilution.[40]

To a certain extent Judge Tjoflat's opinions may be read as limiting proof in vote dilution cases to the analytical framework established in the pre-<u>Bolden</u> cases.[41]   Justice O'Connor explained why such an approach is erroneous:

> [S]everal important aspects of the "results" test had received little attention in this Court's cases or in the decisions of the Courts of Appeals employing that test on which Congress also relied.  Specifically, the legal meaning to be given to the concepts of "racial bloc voting" and "minority voting strength" had been left largely unaddressed by the courts when § 2 was amended.

<u>Gingles</u>, 478 U.S. at 84, 106 S. Ct. at 2784 (O'Connor, J., concurring in the judgment) (internal citation omitted).[42]   As a result, it would be incongruous to rely solely upon the pre-<u>Bolden</u> case law for proper application of the results test, when the case law itself contains very little guidance on the subject.

From a more practical perspective, there are several problems with requiring section 2 plaintiffs to prove the presence, or negate the absence of, racial bias within the voting community.  Judge Hatchett discussed some of these difficulties

---

[40]   It must also be kept in mind that <u>Whitcomb</u> and <u>White</u> were brought under the Fourteenth Amendment, and not section 2.

[41]   <u>See</u> <u>Nipper</u>, 39 F.3d at 1520 (Tjoflat, C.J., joined by one judge); <u>Solomon</u>, 899 F.2d at 1032 (Tjoflat, C.J., specially concurring).

[42]   <u>See</u> <u>also</u> Samuel Issacharoff, <em>Polarized Voting and the Political Process:   The Transformation of Voting Rights Jurisprudence</em>, 90 MICH. L. REV. 1833, 1844-45 (1992) (discussing the many unresolved methodological questions under <u>White</u> and <u>Zimmer</u>).

in his dissent in Johnson v. Mortham, a Fourteenth Amendment equal protection challenge to Florida's Third Congressional District[43]: "First, it is unlikely that voters or political parties motivated through racial considerations will openly admit to being so motivated. Second, plaintiffs engaging in a searching inquiry regarding voters' motivation[s] may be infringing on First Amendment rights." 926 F. Supp. 1460, 1511 (N.D. Fla. 1996) (three judge court) (Hatchett, J., dissenting) (citation omitted).[44] These problems are not unlike those which the Senate Report spoke out against.[45]

---

[43] The Court respectfully disagrees with Judge Hatchett's conclusion that the majority [of which the Court was a member] adopted the racial bias test in its opinion in Johnson v. Mortham. Nevertheless, Judge Hatchett's mistaken reading of the majority opinion in that case does not invalidate the force of his reasoning with respect to the difficulty of proving racial animus within the voting community.

[44] Accord LULAC, 999 F.2d at 909-10 (King, J., joined by Politz, C.J., and Johnson, J., dissenting) (raising similar concerns). See also Arthur v. City of Toledo, 782 F.2d 565 (6th Cir. 1986), an equal protection challenge to a referendum election, where the court determined that there were several policy considerations limiting a court's inquiry into voter motivations: (1) the difficulty "ascertaining what motivated the electorate"; (2) a belief that "the 'bigoted comments of a few citizens, even those with power, should not invalidate action which in fact has a legitimate basis'"; and (3) "the policies underlying the 'secret ballot' prevent courts from inquiring into the votes of the electorate." Id. at 573-74.

[45] For example, in discussing the difficulty in proving discriminatory motivation of legislators, the Senate Report stated:

> The inherent danger in exclusive reliance on proof of motivation lies not only in the difficulties of [a] plaintiff establishing a prima facie case of discrimination, but also in the fact that the defendants can attempt to rebut that circumstantial evidence by planting a false trail of evidence in the form of official resolutions, sponsorship statements and other

Determining the motivation for particular behavior within the voting community would also pose difficult, if not insurmountable, statistical problems.  As discussed in Section I(A)(3), *supra*, a majority of the justices in <u>Gingles</u> approved the use of extreme case analysis and bivariate ecological regression to evaluate the existence of racial bloc voting.[46] Under bivariate regression analysis, the race of the voters is compared with the support provided to particular candidates in order to determine whether there are differences between how majority and minority votes are cast.[47]  If the results of this analysis show that, over the course of a period of time involving numerous elections[48], the "majority vote sufficiently as a bloc to usually defeat the minority's preferred candidates,"[49] then the third <u>Gingles</u> precondition of majority bloc voting has been

_____

legislative history eschewing any racial motive, and advancing other governmental objectives.  So long as the court must make a separate ultimate finding of intent, after accepting proof of the factors involved in the <u>White</u> analysis, that danger remains and seriously clouds the prospects of eradicating the remaining instances of racial discrimination in American elections.

*S. Rep.* at 37, 1982 U.S.C.C.A.N. at 215.

[46]   <u>See also</u> <u>City of Carrollton Branch of NAACP v. Stallings</u>, 829 F.2d 1547, 1558 (11th Cir. 1987) (approving the use of bivariate regression analysis as a proper method of proving racial bloc voting), <u>cert. denied</u>, 485 U.S. 936, 108 S. Ct. 1111, 99 L. Ed. 2d 272 (1988).

[47]   <u>See</u> discussion *supra* note 19.

[48]   <u>See</u> <u>Gingles</u>, 478 U.S. at 57, 106 S. Ct. at 2769-70 (Brennan, J., plurality opinion).

[49]   <u>Gingles</u>, 478 U.S. at 56, 106 S. Ct. at 2769 (Brennan, J., plurality opinion).

established.  Gingles, 478 U.S. at 51, 196 S. Ct. at 2766-67.

But changing this inquiry to also require an explanation into whether the racial bloc voting was caused by racial bias would seem to suggest the need for similar statistical evidence.[50]  If such is the case, then a section 2 plaintiff would have to present evidence of racial polarization through multivariate regression analysis[51].  Presumably, under a multivariate approach, at least two independent variables (the

_____

[50] Simply comparing statistical evidence of racial bloc voting (numerical or "quantitative data") with non-statistical evidence showing the absence of racial bias within the community (non-numerical or "qualitative data," presumably presented through lay testimony and other such evidence), is mixing apples with oranges. See generally MICHAEL Q. PATTON, PRACTICAL EVALUATION 206 (1982) ("When qualitative and quantitative approaches are used together, the data are very often difficult to integrate, and when doubts are raised or conflicts emerge it is qualitative data that most often bear the larger burden of proof.").  This is not to say that such qualitative evidence is irrelevant to a vote dilution challenge. Quite the contrary is true.  Lay testimony of past or present discrimination within a voting community is frequently the most compelling evidence that a minority group does or does not have equal access to the political process --- the Senate factors recognize as much. See S. Rep. at 28-29, 1982 U.S.C.C.A.N. at 206-07. See also MICHAEL Q. PATTON, UTILIZATION-FOCUSED EVALUATION 186-92 (1986) (discussing the differences between quantitative and qualitative methods, and concluding that in many cases they should be used in combination).  However, it is a different story altogether when qualitative evidence describing voters' motivations is said to completely refute quantitative evidence showing widespread racial polarization within a voting community.  Such types of evidence, one scientific and the other not, result from dissimilar measures designed to evaluate distinct questions.

[51] Multivariate regression analysis has been described as "a statistical method that helps determine whether one variable -- [such as] race -- makes an 'independent' contribution to voting decisions once other factors such as newspaper endorsements, incumbency, campaign spending, and the socioeconomic characteristics of the voters are taken into account."  BERNARD GROFMAN, LISA HANDLEY, & RICHARD G. NIEMI, MINORITY REPRESENTATION AND THE QUEST FOR VOTING EQUALITY 83 (1992).  See also Sanchez, 97 F.3d at 1315 (quoting same).

voters' race and whether the voters were racially motivated in the manner in which they cast their ballots[52]) would have to be

---

[52] Since many different variables contribute to what motivates voters to cast their ballots for a particular candidate [see discussion, *infra*], it is doubtful that any meaningful multiple regression analysis could be limited solely to these two independent variables.

For example, in Sanchez, the district court considered over forty variables to explain why voters cast their ballots in the manner that they did. 97 F.3d at 1315. The district court concluded that several factors actually influenced voting behavior within the relevant community, including the candidate's party affiliation, incumbency, the candidate's experience, the candidate's platform, the candidate's name recognition, campaign strategy, finances, campaign efforts, personal characteristics of the candidate, identification of the candidate with past political scandal, and the voter's ethnicity. Id. at 1316 n.21 (quoting Sanchez v. Colorado, 861 F. Supp. 1516, 1527 (D. Colo. 1994)). The Tenth Circuit reversed, holding that the district court erroneously concluded that plaintiffs had to establish the causes of voter behavior in proving the existence of racial bloc voting. Sanchez, 97 F.3d at 1321.

In the instant case, Dr. St. Angelo explained the difficulties of separating out any set number of variables to determine voters' motivations:

> [W]hen a voter walks into the polling place and casts that ballot, that must be in some way the product of all the life experiences that that person has had that is relevant to that casting of that ballot. . . . And when you vote, you vote because you are a white Democrat from north Florida, you attended Florida State University and [were] exposed to the teaching of people at Florida State University, and you go to church and you hear certain things there, and you probably belong to a country club and talk to the people there, and you have friends who are lawyers and you discuss how elections are going to affect your profession, and you probably have an income that you are concerned about and you may take into consideration how that will weigh into the matter, and you might have a young son who might be drafted and so you might consider how the election will affect your young son. All of these things are part of the process of voting.
>
> You voted, everyone else with all the factors that weigh into their voting, voted, and all those figures are

compared to the dependent variable of support provided to a
particular candidate, in order to determine whether the minority
group's inability to elect candidates of its choice was due to
racial bias within the voting community.  However, as Judge King
pointed out in LULAC, the multivariate approach suffers from a
number of defects:

> [T]here is a problem with requiring [multivariate or
> trivariate regression analysis] evidence as an integral
> part of the vote dilution inquiry:  it ignores the
> critical distinction between experimental and non-
> experimental research.  Specifically, it ignores the
> warning of most respected social scientists . . . that
> the *causes* of voting behavior cannot be determined from
> the use of any kind of regression analysis --- whether
> bivariate, trivariate, or multivariate.
>
> \* \* \* \*
>
> Requiring minority plaintiffs to come forward with a
> multivariate regression analysis to determine the
> causes of racially divergent voting patterns . . .
> would implicate the [problem of using intercorrelated
> variables].  [Such] independent variables . . . [as]
> incumbency, campaign expenditures, party
> identification, income, media use measured by cost,
> [and] religion . . . "tend to be correlated, sometimes
> substantially."  Therefore, "it [becomes] difficult, it
> not impossible, to untangle the effects of each
> variable."  By inferring causation from such analysis,

------

listed on [the] sheet . . . that the supervisor of
elections provides for us and then we [statisticians]
analyze it.  All we can say is, whatever happened before
and however it is reflected in these numbers, this is the
way it all comes out.

*St. Angelo Test.*, *1986 Tr.*, Doc. 80 at 114-15.

In summary, pulling one variable from the amalgam of variables
that a voter considers in choosing how to cast his or her ballot
--- in order to discern what impact that variable had in the
voter's decision --- will usually tell little, if nothing at all
about that voter's motivations.  Performing such an analysis of all
voters in an election yields even less reliable information.

we would undoubtedly be engaging in what amounts to an
"almost mindless interpretation[] of regression
analysis in nonexperimental research."  In short, we
would be importing "junk science" into the Voting
Rights Act while rejecting it in other contexts.

\* \* \* \*

[There is also a risk in limiting the analysis to two
independent variables] that the two variables being
studied are only proxies for causal variables that are
not included in the regression equation.

\* \* \* \*

LULAC, 999 F.2d at 907-08 (King, J., joined by Politz, C.J., and

Johnson, J., dissenting) (quoting ELAZAR J. PEDHAZUR, MULTIPLE

REGRESSION IN BEHAVIORAL RESEARCH: EXPLANATION AND PREDICTION (2d ed. 1982))

(emphasis in original).[53]  These methodological defects have

caused a number of courts to rebuff efforts by defendants to use

multivariate analysis as a means of refuting evidence of racially

polarized voting.[54]

_____

[53]    See also Bernard Grofman, Criteria for Redistricting, 33
UCLA L. REV. 77, 141 n.272 (1985) ("multivariate analysis is not
appropriate for the purpose of determining whether or not racially
polarized voting exists").  But see David A. Freeman et al.,
Ecological Regression and Voting Rights, 15 EVAL. REV. 673 (1991)
(describing the utility of a multivariate regression analysis in a
vote dilution case); ABIGAIL M. THERNSTROM, WHOSE VOTES COUNT? 205 (1987)
("Voting patterns must be analyzed to determine not only the level
of support for competing candidates, but the reasons why voters
have cast their ballots as they have.").

[54]    See Gingles, 478 U.S. at 72-73, 106 S. Ct. at 2777-78
(Brennan, J., plurality opinion); Sanchez, 97 F.3d at 1313, 1315-
16; Matthew M. Hoffman, The Illegitimate President: Minority Vote
Dilution and the Electoral College, 105 YALE L.J. 935, 990 & n.260
(1996) (collecting cases, and further noting that "courts have
almost uniformly relied on bivariate regression analysis to
demonstrate vote dilution.").  But see McCord v. City of Fort
Lauderdale, 787 F.2d 1528 (11th Cir. 1986) (accepting the district
court's rejection of bivariate analysis in favor of multivariate
analysis), vacated, 804 F.2d 611; Jones, 730 F.2d at 234-35

Simply stating that defendants would only be permitted to present evidence of a lack of racial bias under the totality of the circumstances would not resolve these evidentiary problems.[55]   After all, what types of evidence would be

_____

(Higginbotham, J., specially concurring) (multivariate regression analysis necessary in evaluating racial bloc voting in order to eliminate alternative causes of voter behavior).  See also Rollins v. Fort Bend Indep. Sch. Dist., 89 F.3d 1205, 1219 (5th Cir. 1996) ("although the plaintiffs were not required under existing case law to present a multi-variate regression analysis comparing the impact of other factors affecting voting, had they done so this evidence may have helped them to prove the existence of a significant bloc vote").

[55]   A number of courts have suggested the use of a framework in section 2 cases which is similar to the McDonnell Douglas framework applied in Title VII cases.  See, e.g., Uno, 72 F.3d at 982-83; Solomon, 899 F.2d at 1035 (Tjoflat, C.J., specially concurring) (discussed in Section I(B)(1), supra); Reed, 914 F. Supp. at 878-79.  See also LULAC, 999 F.2d at 909 n.8 (King, J., joined by Politz, C.J., and Johnson, J., dissenting) (summarizing this analytical framework); Bossier Parish Sch. Bd. v. Reno, 907 F. Supp. 434, 446 (D.D.C. 1995) (same), probable jurisdiction noted, ___ U.S. ___, 116 S. Ct. 1874, 135 L. Ed. 2d 171 (1996).  Under this approach, a section 2 plaintiff's demonstration of the three Gingles factors would create an inference of racial discrimination within the voting community.  A defendant would then have the opportunity to rebut this evidence under the totality of the circumstances, presumably through producing evidence that racial bloc voting could be explained by causes other than racial animus. If the plaintiff failed to sufficiently counter the defendant's evidence, then the inference of discrimination would disappear and judgement would have to be entered in favor of the defendant.

In addition to the evidentiary problems discussed above, this approach is troublesome in two respects.  First, it ignores language in the Senate Report which expressly states that such an inference of racial animus is unnecessary:

The Fifth Circuit, when it affirmed Bolden in 1978, held that the White-Zimmer factors allowed the district court to infer discriminatory purpose.  Under the Committee bill that step is unnecessary: a finding of the appropriate factors showing current dilution is sufficient, without any need to decide whether those findings, by themselves, or with additional circumstantial evidence, also would warrant an inference

submitted by a defendant to rebut the "inference of racial discrimination within the voting community" created by the presence of the three _Gingles_ factors? Qualitative evidence (which cannot be readily compared to the plaintiff's quantitative proof of bloc voting), quantitative evidence resulting from a multivariate regression analysis (which cannot state with precision what caused the bloc voting), or some combination of both qualitative and quantitative evidence. A district court reviewing a section 2 claim would be left without a principled method of reconciling a plaintiff's proof of racial bloc voting through evidence showing the three _Gingles_ factors are met[56], with the defendant's competing causal evidence presented under

---

of discriminatory purpose.

_S. Rep._ at 28 n.112, 1982 U.S.C.C.A.N. at 206 n.112. Second, it ignores the fact that under _DeGrandy_, a "comprehensive, not limited, canvassing of relevant facts" requires that even where a plaintiff establishes the three _Gingles_ preconditions and defendant has presented nothing in rebuttal, a district court "must also examine other evidence in the totality of the circumstances." ___ U.S. at ___, 114 S. Ct. at 2657. _See generally_ NAACP v. City of Niagara Falls, 65 F.3d 1002, 1008 (2d Cir. 1995) (same). _Cf. Sanchez_, 97 F.3d at 1310-11 (noting that while proof of the three _Gingles_ factors "creates the inference the challenged practice is discriminatory," they are "not sufficient" to prove a section 2 claim); Harvell v. Blytheville Sch. Dist. #5, 71 F.3d 1382, 1390 (8th Cir. 1995) ("Satisfaction of the necessary _Gingles_ preconditions carries a plaintiff a long way towards a section 2 violation, but in the final analysis [the plaintiff] must still show that the challenged electoral scheme provides minority voters" with unequal access to the political process), _cert. denied_, ___ U.S. ___, 116 S. Ct. 1876, 135 L. Ed. 2d 172 (1996).

[56]  It is well accepted in this Circuit that demonstrating majority bloc voting goes a long way towards establishing race-conscious politics. _See_ United States v. Morengo County Comm'n, 731 F.2d 1546, 1567 (11th Cir.), _cert. denied_, 469 U.S. 976, 105 S. Ct. 375, 83 L. Ed. 2d 311 (1984). _Accord_ Solomon, 899 F.2d at 1016 n.3 (Kravitch, J., specially concurring).

the totality of the circumstances.  Evaluation of a vote dilution
claim under such conditions would truly become nothing more than
"an intuitive call of the trial judge."  <u>Clark v. Calhoun County</u>,
88 F.3d 1393, 1397 (5th Cir. 1996), <u>reh'q and suggestion for
reh'q en banc denied</u>, 95 F.3d 1151.

Requiring a plaintiff to negate non-racial causes put forth
by a defendant under the totality of the circumstances inquiry
would also effectively reintroduce the <u>Bolden</u> intent test into
the vote dilution analysis.  A defendant could always come up
with some plausible cause or causes which could explain away
sustained racially polarized voting[57].  The section 2 plaintiff,
who at all times bears the burden of proof, would then be forced
to counter that causal evidence by showing that the voting
community is in fact driven by racial animus.  While a plaintiff
would be under "no obligation to search [innocent explanations of
voter behavior] and disprove them preemptively,"[58] he or she
would nevertheless face the onerous task of disproving the
proffered reasons submitted by the defendant.  As the foregoing
discussion on the problems of proving causation makes clear, this
resurrected form of the intent test will create "an inordinately
difficult burden for plaintiffs in most cases."  <i>S. Rep.</i> at 36,
1982 U.S.C.C.A.N. at 214.  It would also "ask the wrong question,"
improperly emphasizing voter motivations, instead of "whether

---

[57]   For examples of alternative causes of voter behavior, <u>see</u>
<u>Sanchez</u>, 97 F.3d at 1315-16, discussed in note 52, <i>supra</i>.

[58]   <u>Nipper</u>, 39 F.3d at 1525 n.64 (Tjoflat, C.J., joined by one
judge).

minorities have equal access to the process of electing their representatives." Id.[59]

Moreover, the Court is concerned that making racial bias the focus of a vote dilution inquiry would treat the absence of such bias as a "safe harbor" for a section 2 defendant --- even in the face of sustained racially polarized voting and unequal minority access to the political process. DeGrandy speaks against treating any single factor, whether it is electoral success, proportionality[60], or some other evidence (such as lack of racial bias in the community[61]) as being dispositive:  "*No single statistic* provides courts with a short-cut to determine whether a . . . district[] unlawfully dilutes minority voting strength." ___ U.S. at ___, 114 S. Ct. at 2661-62 (emphasis added).  Why is this the case?  Because "[a]n inflexible rule

---

[59] See also S. Rep. at 16, 1982 U.S.C.C.A.N. at 193 ("The Committee has concluded that [the Bolden] intent test places an unacceptably difficult burden on plaintiffs.  It diverts the judicial [inquiry] from the crucial question of whether minorities have equal access to the electoral process to a historical question of individual motives.").

[60] See generally DeGrandy, ___ U.S. at ___, 114 S. Ct. at 2664 (O'Connor, J., concurring) ("[P]roportionality is never dispositive.  Lack of proportionality can never by itself prove dilution, for courts must always carefully and searchingly review the totality of the circumstances, including the extent to which minority groups have access to the political process."); id. at ___, 114 S. Ct. at 2665 (Kennedy, J., concurring) ("[A] lack of proportionality is 'never dispositive' proof of vote dilution, just as the presence of proportionality 'is not a safe harbor for States [and] does not immunize their election schemes from § 2 challenge.'").

[61] As discussed in Section I(C)(1)(b), infra, while the existence of racial bias is not dispositive to proving a violation of section 2, it may be considered as one factor supporting unlawful vote dilution.

would run counter to the textual command of § 2, that the
presence or absence of a violation be assessed 'based on the
totality of circumstances.'"  _Id._ at ___, 114 S. Ct. at 2660
(quoting 42 U.S.C. § 1973(b)).

Finally, treating the absence of racial bias as dispositive
of a section 2 claim ignores the harsh reality that in many
communities, present socio-economic effects of past
discrimination interact with a voting structure or practice in a
manner which denies a minority group equal political opportunity.
The Senate Report indicates that such an "accumulation of
discrimination" is actionable under section 2:

> [A]s Senator Jarvis put it, the purpose of the Voting
> Rights Act was "not only to correct an active history
> of discrimination, the denying to Negroes of the right
> to register and vote, but also to deal with the
> accumulation of discrimination . . . . The bill would
> attempt to do something about accumulated wrongs and
> the continuance of the wrongs.

_S. Rep._ at 5, 1982 U.S.C.C.A.N. at 182 (quoting 111 CONG. REC. 8295
(1965) (Statement of Sen. Jarvis)).  _See also S. Rep._ at 29 &
n.114, 1982 U.S.C.C.A.N. at 206-07 & n.114 (socio-economic
conditions resulting from past discrimination which limit
minority political participation are one factor to consider in
determining whether a minority group has equal political
participation).  _Cf._ _Gingles_, 478 U.S. at 47, 106 S. Ct. at 2764
("The essence of a § 2 claim is that a certain electoral law,
practice, or structure interacts with social and historical
conditions to cause an inequality in the opportunities enjoyed by

black and white voters to elect their preferred
representatives.").[62]  A recent Fifth Circuit decision provides
an effective example of when the present effects of past racial
bias in a community can be remedied under section 2.  In Teague
v. Attala County, 92 F.3d 283, 293-95 (5th Cir. 1996), the court
found unlawful vote dilution existed where the state had a long
history of discriminating against blacks, there were "grave
socioeconomic disparities" in the educational achievement and
employment opportunities of blacks compared to whites in the
community, and blacks were actually registered to vote and voted
at a significantly lower rate than whites in the community.
Under such circumstances, how can it be said that evidence the
voting community is not motivated by racial bias should always,
as a matter of law, preclude section 2 liability?  The Court does
not believe that such a result was intended under the 1982

---

[62]  A section 2 plaintiff must show more than socio-economic
disparities and lack of electoral success to establish vote
dilution.  If present socio-economic effects of past discrimination
have not actually interacted with the challenged voting practice or
structure to dilute a minority group's access to the political
process, then no claim could be stated under section 2.  See
generally Johnson v. Mortham, 926 F. Supp. at 1476-77 & n.27 ("The
reason for showing decreased voter participation is because '[t]he
Voting Rights Act and Fifteenth Amendment apply only to racial
discrimination, not discrimination based on socio-economic
status.'") (quoting Howard v. Kelly, 1994 WL 118211, at *1 (D.D.C.
Mar. 31, 1994)).  However, where such effects are shown, "and where
the level of black participation in politics is depressed,
plaintiffs need not prove any further causal nexus between their
disparate socio-economic status and the depressed level of
political participation." S. Rep. at 29 n.114, 1982 U.S.C.C.A.N. at
206-07 n.114.

amendment.[63]

In summary, where a defendant offers unrebutted proof that there is no racial bias in the subject community, does the defendant always prevail under the results test?  The simple answer is no.  The absence of racial bias, like proportionality, is certainly some evidence that a minority group has equal access to the political process.  However, it does not automatically preclude a finding of liability under section 2.[64]

---

[63] If a vote dilution claim with the facts in Teague could not be stated under the results test, it seems unlikely that such a claim could ever be established absent proof of discriminatory intent in the voting community.  Congress noted similar problems occurred in the aftermath of Bolden, when "[m]inority voters lost some cases despite egregious factual situations." S. Rep. at 37, 1982 U.S.C.C.A.N. at 215.  The 1982 amendment to section 2 was designed to remedy this anomalous result.

Case law in this Circuit supports the Court's conclusion.  In United States v. Morengo County Commission, the court wrote:

"As overtly bigoted behavior has become more unfashionable, evidence of intent has become harder to find."  But the continuing effects of past discrimination are still with us.  This is one of the principal reasons Congress found it necessary to adopt a results test to root out the effects of past discrimination.  Evidence of racism can be very significant if it is present. But its absence should not weigh heavily against a plaintiff proceeding under the results test of section 2.

731 F.2d 1546, 1567 & n.36 (11th Cir.), appeal dismissed, cert. denied, 469 U.S. 976, 105 S. Ct. 375, 83 L. Ed. 2d 371 (1984) (internal citations omitted) (emphasis added).

[64] Judge Gleeson recently reached a similar conclusion in Goosby v. Town Board of Town of Hempstead:

The "critical question," according to defendants, is whether the white bloc voting "arises from racial bias in the community rather than from partisan politics."  If plaintiffs cannot prove that such bias infects the voting community, defendants contend, the Section 2 claim must fail . . . .

### b.   Racial bias may be considered under the results test:

Having found that evidence of racial bias is not necessarily dispositive of liability under section 2, the Court will turn to what it believes to be a far simpler issue:  does racial bias in the voting community have any role under the results test? Considering the discussion in the preceding section, the answer should come as no great surprise.  Racial bias may be considered in assessing a vote dilution claim, as one factor among many under the totality of the circumstances.

In _Gingles_, the justices divided over the issue of whether causation has any relevance under the results test codified in section 2[65].  Nevertheless, the Court believes that a careful reading of the opinions in _Gingles_ dictates that consideration of causation[66] is "irrelevant in the inquiry into the three _Gingles_

---

I disagree.  I conclude that neither the existence (or non-existence) of racial bias in the community nor the strength of the correlation between partisan politics and divergent voting patterns can be dispositive in a Section 2 case.  Rather, they are simply among the many factors to be considered in determining whether, under the totality of the circumstances, an at-large scheme has impaired the ability of black voters in the Town to participate equally in Town Board elections.

___ F. Supp. ___, ___, 1997 WL 74399, at **28-29 (E.D.N.Y. Feb. 20, 1997) (internal citations omitted).

[65]   See _Gingles_, 478 U.S. at 62-63, 106 S. Ct. at 2772-73 (Brennan, J., with three justices concurring); _id._ at 100, 106 S. Ct. at 2792 (O'Connor, J., concurring in the judgment).   The respective positions of Justices Brennan and O'Connor are discussed in detail in Section I(A)(3), _supra_.

[66]   Such as the presence or absence of racial bias within the voting community, election results explained by partisan politics, or other possible causes.

preconditions, but relevant in the totality of the circumstances inquiry." Lewis v. Alamance County, 99 F.3d 600, 615 n.12 (4th Cir. 1996), petition for cert. filed, 65 U.S.L.W. 3632 (U.S. Mar. 4, 1997) (No. 96-1404) (citing the Brennan and O'Connor opinions). This conclusion is unremarkable when viewed in tandem with the requirement that a district court conduct a "searching practical evaluation of the 'past and present realty'"[67] of the subject community to determine whether a minority group has equal access to the political process.

Moreover, many of the Senate factors are specifically directed towards the presence of racial animus within the community. For example, the degree of racially polarized voting, "whether political campaigns have been characterized by overt or subtle racial appeals," and the extent to which elected officials are responsive to the needs of a minority group, all suggest an inquiry into the motivations of voters or their elected officials.[68] See S. Rep. at 28-29, 1982 U.S.C.C.A.N. at 206-07.

---

[67] S. Rep. at 30, 1982 U.S.C.C.A.N. at 208 (quoting White, 412 U.S. at 769-70, 93 S. Ct. at 2341).

[68] The Court must depart from Judge Hatchett's opinion in Nipper to the extent that he suggests otherwise. See 39 F.3d at 1550-51 (Hatchett, J., dissenting) (finding that the Senate factors are directed towards the conduct of state officials), and discussion contained in Section I(B)(2), supra. As one student commentator observed, it is unclear how some of the totality factors are related to the motivations of officials alone. See Paula W. Render, Comment, Straight Party Tickets and Redistricting Thickets: Nonracial Motivations for Voter Preferences, 1995 U. CHI. LEGAL F. 505, 514 n.60. Nevertheless, the Court believes Judge Hatchett's statement that Congress enacted section 2 "within the constitutional confines of its ability to regulate state action" [Nipper, 39 F.3d at 1549 (Hatchett, J., dissenting)], may be reconciled with a consideration of private individuals' motivations

Justice O'Connor explained why evidence pertaining to voters' motivations can be relevant under the results test:

> I believe Congress also intended that explanations of the reasons why white voters rejected minority candidates would be probative of the likelihood that candidates elected without decisive minority support would be willing to take the minority's interests into account.  In a community that is polarized along racial lines, racial hostility may bar these and other indirect avenues of political influence to a much greater extent than in a community where racial animosity is absent although the interests of racial groups diverge . . . . The overall vote dilution inquiry neither requires nor permits an arbitrary rule against consideration of all evidence concerning voting preferences other than statistical evidence of racial voting patterns.

Gingles, 478 U.S. at 100-01, 106 S. Ct. at 2792 (O'Connor, J., concurring in the judgment).  The Court agrees with Justice O'Connor's reasoning.  Racial bias evidence will often be highly probative as to whether or not a minority group has the opportunity to elect the representatives of its choice.  Therefore, the Court declines to adopt a *per se* rule precluding racial bias evidence presented under the Senate factors.

Case law within this Circuit supports the Court's conclusion.  In <u>Johnson v. DeSoto County Board of Commissioners</u>,

---

under the totality of the circumstances.  When individuals within the voting community are motivated by racial bias in a manner that denies a minority group equal access to the political process, section 2 is violated --- not by the conduct of the individuals in engaging in such discrimination, but by actions of the state in governing the election process and recognizing the results of such discrimination.  This distinction, albeit a subtle one, ensures that section 2 remains a constitutional exercise of congressional authority under the Fourteenth and Fifteenth Amendments, even when it seems to operate in a manner placing constraints on individual, and not official, conduct.

the panel addressed at length the role that racial animus or
intent plays in the vote dilution inquiry:

> We are left with the question of what effect a finding
> of intent to discriminate has in the § 2 calculus.  The
> School Board argues it has no effect, but we reject
> that position.
>
> * * * *
>
> [Although *proof of discriminatory intent* is not
> dispositive, it] *is not irrelevant in a § 2 action.*  It
> is circumstantial evidence of discriminatory results
> that should be considered in assessing the "totality of
> the circumstances."  Where it can be inferred, as it
> often can be, that the enactors were in a good position
> to know the effect their actions would have, the fact
> that the enactment was motivated by a desire to produce
> discriminatory results will often be strong, albeit
> circumstantial, evidence that such results were
> achieved.  Nothing in *Voinovich* or any other Supreme
> Court decision, and nothing in the language of § 2
> itself, prohibits drawing an evidentiary inference
> about results from intent.  Of course, the evidentiary
> weight that intent to discriminate should be given will
> vary, depending upon the circumstances.
>
> * * * *

72 F.3d at 1564-65 (emphasis added).  Furthermore, in Meek II,
the Eleventh Circuit affirmed the district court's finding of
vote dilution based, in part, on the failure of the defendants to
show that the "keen hostility" between blacks and hispanics and
the use of overt and subtle racial or ethnic appeals during
campaigns did not motivate voter behavior.[69]  See 985 F.2d at
1486-88.  The lesson to be taken from these two cases is that,
like the Senate factors, the existence or non-existence of racial

---

[69]   However, as previously stated in note 3, *supra*, the
Eleventh Circuit declined in Meek II to "decide the unresolved
issue in *Solomon*."  985 F.2d at 1487.

bias in the voting community can be strong evidence of whether a
minority group has equal access to the political process.   In
other words, evidence showing discriminatory motives can make it
easier to find discriminatory results.

Decisions from other courts have also indicated that racial
bias has a role to play under the results test.[70]  However, the
Court must part company with these decisions to the extent that
they suggest the presence or absence of racial bias in the voting
community is necessarily dispositive of the vote dilution
inquiry.  As Judge Gleeson explained in Goosby:

> [T]he fact that divergent voting patterns may logically
> be explained by a factor other than race does not end
> the inquiry, nor does it require plaintiffs to prove
> racial bias in the community or that political parties
> in the [community] serve as "proxies" for racism.  The
> relevant factors here are not mutually exclusive.  It
> is possible for race-neutral factors, such as political
> partisanship, to co-exist with race-based ones, such as
> diminished access to the slating process or
> insensitivity by elected officials to the
> particularized needs of the minority community.  Thus,
> "even if [proof of a race-neutral cause of divergent
> voting patterns] is forthcoming, the defendant does not
> automatically triumph.  Instead, the court must
> determine whether, based on the totality of the
> circumstances . . . . the plaintiffs have proven that
> the minority group was denied access to the political
> system [with respect to] race."

____ F. Supp. at ___, 1997 WL 74399, at *31 (quoting Uno, 72 F.3d
at 983[71]).  Thus, in considering whether the voting community is

_____

[70]  See cases cited in note 36, *supra*.

[71]  Uno used the phrase "on account of race" instead of "with
respect to race."  See 72 F.3d at 983.  Although section 2 uses the
phrase "on account of race" [see 42 U.S.C. § 1973(a)], the Court
has substituted the phrase "with respect to race" to reflect the

driven by racial bias, a court must be careful not to allow the presentation of any such causal evidence to divert its attention from the ultimate inquiry required by section 2: whether "a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." _Gingles_, 478 U.S. at 47, 106 S. Ct. at 2764. In addition, since evidence of racial bias is to be treated as a factor under the totality of the circumstances, the failure of a plaintiff to establish racial bias "is not rebuttal evidence of non-dilution." Rather, section 2 "requires the court's overall judgment, based on the totality of the circumstances and guided by those relevant factors in the particular case, of whether the voting strength of minority voters is . . . 'minimized or canceled out.'" _S. Rep._ at 29 n.118, 1982 U.S.C.C.A.N. at 207 n.118.

In the final analysis, the Court's interpretation does not lead to proportional representation. "[W]hen voting rights plaintiffs establish the three _Gingles_ threshold factors -- geographical compactness, political cohesiveness, and racial bloc voting -- defendants can still demonstrate that under the totality of the circumstances, the plaintiffs have failed to present a valid vote dilution claim." _Nipper_, 39 F.3d at 1555 (Hatchett, J., dissenting). How can defendants make such a

---

proper meaning of the statutory language. _See S. Rep._ at 27-28 n.109, 1982 U.S.C.C.A.N. at 205-06 n.109, which is set out and discussed in greater detail in Section I(C)(1)(a), _supra_.

showing?  Through evidence suggesting that plaintiffs have equal access to the political process, such as a consistent ability to elect the candidate of their choice, proportionality, or lack of sustained racially polarized voting.  Furthermore, it may be possible to show that the plaintiffs live in a community in which they are able "to form effective coalitions with voters from other racial and ethnic groups, having no need to be a majority within a single district in order to elect candidates of their choice."  DeGrandy, ___ U.S. at ___, 114 S. Ct. at 2661.  "[T]he inability to elect representatives of their choice is not sufficient to establish a violation unless, under the totality of the circumstances, it can also be said that the members of the protected class have less opportunity to participate in the political process."  United States v. Jones, 57 F.3d 1020, 1024-25 (11th Cir. 1995) (quoting Chisom v. Roemer, 501 U.S. 380, 397, 111 S. Ct. 2354, 2365, 115 L. Ed. 2d 348 (1991)).  After all, section 2 does not guarantee particular results or proportionate representation.

### 2.    The Court's Test:

In its extended passage through the judicial thicket of section 2, the Court has attempted to follow a path which was initially carved out by Congress in 1965.  There have been many stumbling blocks along the way.  The path itself is overgrown with the incomplete opinions of both pre- and post-Bolden opinions.  Jagged stones of statistical evidence and testimony of non-racial causes for polarization litter the way, and cut into

72

the feet of the unwary traveler.  What appears to be a fork in
the path --- with one way going towards equality of political
opportunity for minority voters and the other one avoiding
proportional representation --- can readily divert even the most
well-intentioned walker away from a proper vote dilution inquiry
into the quagmire which surrounds it.  The Court hopes that it
has successfully navigated these obstacles to arrive at its
ultimate destination: a reasoned methodology for examining claims
under section 2 that is consistent with what the congressional
trailblazers intended.

In order to prove unlawful vote dilution, in violation of
section 2, a plaintiff must meet the following test.  First, the
plaintiff must demonstrate the three <u>Gingles</u> factors of
geographical compactness, political cohesiveness, and racial bloc
voting.  If one or more of the <u>Gingles</u> factors is not shown, then
the defendant prevails.  If all three factors are proven, then
the court must review all relevant evidence under the totality of
the circumstances.  The defendant may present evidence of the
lack of racial bias in the community, proportionate
representation, past and present electoral success, as well as
proof of other factors which are indicative of the existence or
non-existence of vote dilution.  The plaintiff may respond in
kind.  Without treating any single factor as dispositive, the
reviewing court will finally determine through a searching
inquiry whether the members of the minority group are denied
equal political opportunity with respect to their race or color.

If they are, then a claim under section 2 has been established. Needless to say, this "is not an easy test" to meet. *S. Rep.* at 31, 1982 U.S.C.C.A.N. at 209.

It is doubtful that the instant opinion will be the final word on how a court should proceed under section 2. Nevertheless, the Court hopes that the test which it has developed adds some clarity to this complex area of the law. More particularly, application of this test to the facts of the case at bar will enable a final resolution on the merits of the parties' claims.

### Part II. Scope Of The Court's Inquiry On Remand:

Notwithstanding the fact that the Eleventh Circuit held, as a matter of law that Plaintiffs "have satisfied the three Gingles factors" [Solomon, 899 F.2d at 1013], Defendants urge the Court to reexamine two of those factors: geographical compactness and racial bloc voting. See Doc. 149 at 6-11. Defendants contend new evidence presented after remand demonstrates that, in light of the 1990 census, blacks do not constitute a majority of the population, voting age population, or registered voters in any of the five residential districts in Solomon County.[72] In

---

[72] Plaintiffs' demographics expert, Martha Chapman, testified that she devised a single member district plan comprised of five districts. Both the Liberty County School Board and the Liberty County Commission adopted Ms. Chapman's plan, using the districts as "residency" districts for at-large elections. In other words, School Board and County Commission candidates reside within one of the five districts, but are elected by all registered voters in Liberty County. *Chapman Test.*, *1986 Tr.*, Doc. 81 at 37. See also Pls.' *Ex.* 9 (minutes and resolutions of county commission and school board, describing and adopting the election districts devised by Ms. Chapman).

74

addition, Defendants maintain that Plaintiffs have not
established racial bloc voting for two reasons.  First,
Defendants argue that prior to the initial trial of this cause,
the small number of elections in Solomon County involving black
candidates[73] was "insufficient to determine whether black
voters' preferred candidates are <u>usually</u> defeated by the white
majority in Liberty County."  Doc. 149 at 10 (emphasis in
original).  Second, Defendants assert that the electoral success
of Earl Jennings, a black candidate who defeated white candidates
on three occasions, "definitely points to a conclusion that black
voters' preferred candidates are <u>not usually</u> defeated by Liberty
County's white majority."  Doc. 149 at 11 (emphasis in original).

Resolution of this question is governed by the "mandate
rule."  The mandate rule requires a district court to strictly
comply with the terms of a circuit court's opinion when a case is
remanded.  <u>E.g.</u>, <u>Pelletier v. Zweifel</u>, 987 F.2d 716, 718 (11th
Cir.) (collecting citations), <u>cert. denied</u>, 510 U.S. 918, 114 S.
Ct. 311, 126 L. Ed. 2d 258 (1993).  The rule is derived from the
law of the case doctrine[74], which "operates to create

---

[73]   There were six elections involving three different black
citizens.  <i>St. Angelo Test.</i>, <i>1986 Tr.</i>, Doc. 81 at 87-88, 223-24;
<i>Pls.' Ex.</i> 17, Tables 1 & 4.

[74]   See <u>Messinger v. Anderson</u>, where Justice Holmes noted that

"law of the case," as applied to the effect of previous
orders on the later action of the court rendering them in
the same case, merely expresses the practice of courts
generally to refuse to reopen what has been decided.

225 U.S. 436, 444, 32 S. Ct. 739, 740, 56 L. Ed. 1152 (1912).

efficiency, finality, and obedience within the judicial system."
Litman v. Massachusetts Mut. Life Ins. Co., 825 F.2d 1506, 1511
(11th Cir. 1987) (en banc), cert. denied, 484 U.S. 1006, 108 S.
Ct. 700, 98 L. Ed. 2d 652 (1988).  A district court may
reconsider matters once decided under the following limited
exceptions to the mandate rule:  (1) new and substantially
different evidence is presented in a subsequent trial; (2) there
is an intervening change of controlling authority on the issue in
question; or (3) the prior decision was clearly erroneous and
would work manifest injustice.  Heathcoat v. Potts, 905 F.2d 367,
370 (11th Cir. 1990) (citations omitted).  However, where the
circuit court has merely vacated judgment "for consideration in
light of a particular decision," the mandate is "'much more
limited in nature' than a general vacation by an appellate court,
and its effect is 'not to nullify all prior proceedings.'"
United States v. Tamayo, 80 F.3d 1514, 1520 (11th Cir. 1996)
(quoting United State v. M.C.C. of Florida, Inc., 967 F.2d 1559,
1562 (11th Cir. 1992)).

With respect to the establishment of the Gingles factors,
the Eleventh Circuit's order remanding this case falls within the
category of limited mandates.  The order states:

> Because we are divided in out interpretation of Gingles
> and section 2 of the Voting Rights Act, 42 U.S.C. §
> 1973 (1982), we do not specifically direct the district
> court how to proceed on remand.  Rather, we instruct
> the district court to proceed in accordance with
> Gingles, giving due consideration to the views
> expressed in Chief Judge Tjoflat's and Judge Kravitch's
> specially concurring opinions.

899 F.2d at 1013.  Both Judge Tjoflat and Judge Kravitch found
that the three <u>Gingles</u> factors had been established.  <u>See</u>
<u>Solomon</u>, 899 F.2d at 1013; <u>id.</u> at 1021 (Kravitch, J., specially
concurring); <u>id.</u> at 1037 (Tjoflat, C.J., specially concurring).
Thus, the Court is without jurisdiction to entertain Defendants'
request to reconsider the Eleventh Circuit's findings on the
three <u>Gingles</u> factors.[75]

───────────────────

[75] Even if this were not the case, the Court would still hold
that the three <u>Gingles</u> factors have been established as a matter of
law.

Regarding the existence of the first <u>Gingles</u> factor,
geographical compactness, Defendants try to have it both ways.
They first suggest that the Court should take judicial notice of
1990 census results showing that blacks do not comprise a majority
in any of the five residential districts in Solomon County
(including District 1, where blacks comprised a majority of the
black voting age population before 1990).  At the same time, they
contend that Plaintiffs should not be afforded the opportunity to
adjust the lines of their proposed remedial districts in light of
these census results --- to bring a sufficient number of blacks
into a single district, where they would comprise a majority of the
voting age population.  <u>See</u> <u>generally</u> 1991 Tr. at 70 (Defendants
stipulated "under the 1990 census, there could be created some
other possible district in which there would be a black majority in
Liberty County . . .").  Fundamental fairness to both parties, not
just Defendants, would dictate that the Court cannot take such a
heavy-handed and one-sided approach.

Defendants' arguments concerning the third <u>Gingles</u> factor,
racial bloc voting, are similarly without merit.   The Court
believes that Defendants' first contention [concerning the small
number of elections in Solomon County involving black candidates]
was implicitly rejected by the <u>Solomon</u> court, which clearly had the
benefit of such evidence.  <u>See</u> <u>Solomon</u>, 899 F.2d at 1020-21
(Kravitch, J., specially concurring); <u>id.</u> at 1037 (Tjoflat, C.J.,
specially concurring).  Defendants' alternative assertion that the
electoral success of Earl Jennings precludes a finding of white
bloc voting, while a somewhat closer question, would still have to
be rejected.  Electoral success of a single candidate in the face
of racially polarized voting, which has otherwise been present,
does not foreclose a finding of unlawful vote dilution.  <u>See</u> S.
Rep. at 29 n.115, 1982 U.S.C.C.A.N. at 207 n.115.

Conversely, the Court believes that the Circuit Court's
mandate requires the Court to examine the record evidence and
make new findings of fact and conclusions of law [aside from the
three Gingles factors] under the totality of the circumstances.
Judge Tjoflat's specially concurring opinion is explicit on this
point. See Solomon, 899 F.2d at 1037 & n.14 (Tjoflat, C.J.,
specially concurring). Judge Kravitch's specially concurring
opinion does not have a similar mandate. However, Judge Kravitch
implied in her opinion that the establishment of the three
Gingles factors is sufficient to state a claim under section
2.[76] The intervening Supreme Court decision in DeGrandy has
since made it clear that a court must review all relevant
evidence under the totality of the circumstances, even after the
three Gingles factors are shown. See ___ U.S. at ___, 114 S. Ct.
at 2657. Consequently, it appears that the Court must engage in
the totality of circumstances inquiry under each of the Solomon
judges' specially concurring opinions. Such an examination would
also be consistent with this Circuit's rule in Voting Rights Act
cases that district courts "explain with particularity their
reasoning and the subsidiary factual conclusions underlying their
reasoning." Cross v. Baxter, 604 F.2d 875, 879 (5th Cir.
1979)[77], vacated on other grounds, 704 F.2d 143 (5th Cir. 1983).

In summary, the Court will not make new findings as to the

---

[76]   See citations contained in note 10, *supra*.

[77]   In Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th
Cir. 1981) (en banc), the Eleventh Circuit adopted as precedent the
decisions of the Fifth Circuit rendered prior to October 1, 1981.

existence of the three _Gingles_ factors.   Those factors have been
established as a matter of law.   Instead, the Court will limit
its focus to all of the relevant evidence under the totality of
the circumstances, including proof of the Senate factors and the
presence or absence of racial bias in the voting community.   The
Court will then conclude by stating whether, as a matter of law
and fact, Plaintiffs have succeeded in establishing their vote
dilution claims.

### Part III. Findings:

The Court now turns to the record evidence to determine
whether Plaintiffs have established liability under section 2.
Preliminarily, the Court notes that Defendants have pending
requests for judicial notice of Earl Jennings' re-elections to
terms on the Liberty County Commission in 1992 and 1996.   See
Docs. 133 & 148.  These requests are GRANTED.   The Court also
deems it proper, on its own motion, to take judicial notice of
additional data from the 1990 census which the parties have
failed to enter into the record.[78]  Specifically, at the 1991
retrial Defendants only submitted census data from Liberty County
residential district 1 (comprised of precincts 1 and 2) [see

---

[78]   Judicial notice of adjudicative facts may be taken _sua
sponte_.  See, e.g., FED. R. EVID. 201(c); FDIC v. Houde, 90 F.3d 600,
607-08 (1st Cir. 1996); United States v. Evans, 994 F.2d 317, 322
n.1 (7th Cir.), cert. denied, 510 U.S. 927, 114 S. Ct. 335, 126 L.
Ed. 2d 280 (1993).  The Eleventh Circuit has held that census data
is an adjudicative fact within the scope of Federal Rule of
Evidence 201(b).   See, e.g., Hollis v. Davis, 941 F.2d 1471, 1474
(11th Cir. 1991), cert. denied, 503 U.S. 938, 112 S. Ct. 1478, 117
L. Ed. 2d 621 (1992); Moore v. Comfed Savings Bank, 908 F.2d 834,
841 n.4 (11th Cir. 1990), reh'g denied, 917 F.2d 570.

*Defs.' Ex.* 1A *(from 1991 Trial)*], even though county-wide census
data is clearly relevant to the Court's section 2 analysis.
County-wide census data is drawn from UNIVERSITY PRESS OF FLORIDA,
1990 CENSUS HANDBOOK FLORIDA (1994) *(hereinafter* "CENSUS"), a summary
of 1990 census data collected and published by the United States
Department of Commerce, Bureau of the Census.

A.   **General Background:**

     Liberty County, Florida, is located in Northwestern Florida,
within the Northern District of Florida.  When this case was
originally tried, it had a population of 4260, of which 471, or
11.06 percent, were black. *Findings* at 2.  At the time of the
1990 census, Liberty County had a population of 5569, of which
982, or 17.63 percent, were black. CENSUS at 31.  A total of 3320
people were of voting age population (that is, over the age of
eighteen), of which 831, or 25.03 percent, were black.  Id. at
40.  Most blacks (approximately ninety percent in 1986) live in
the northwest quadrant of Liberty County, in residential district
1, which includes the first and second precincts (Rock Bluff and
Annex, respectively).  See *Pls.' Exs.* 16 and 20, Table 6; *Chapman
Test., 1986 Tr.*, Doc. 81 at 41-42, 71, 75; *St. Angelo Test., 1986
Tr.*, Doc. 81 at 209; *Shofner Test., 1986 Tr.*, Doc. 82 at 52.  In
November, 1991, blacks comprised 295 out of 640, or 46.09
percent, of all the registered voters in residential district
one.  *Defs.' Ex.* 2A *(from 1991 Trial)*.  Voters in Liberty County

(both white and black) are predominately Democrats[79].  See *St. Angelo Test., 1986 Tr.*, Doc. 81 at 92-93. The level of political competition in the county is "high." *Billings Test., 1986 Tr.*, Doc. 77 at 40.

The five members of the Liberty County School Board and of the Liberty County Board of County Commissioners each serve staggered four-year terms. See Fla. Const. Art. VIII, § 1(e) (West 1995 & Supp. 1997) (county commission); Fla. Stat. § 100.041(2) (West 1982 & Supp. 1997) (county commission); Fla. Stat. § 100.041(3) (school board); Fla. Stat. §§ 230.04-.05, 230.061 (West 1989 & Supp. 1997) (school board).  The voting districts, comprised of five residency districts that are approximately equal in population (according to the 1980 census), are the same for both County Commission and School Board elections. See *Pls.' Ex.* 20, Table 6.  Candidates run for numbered seats corresponding to the district in which they reside, and are elected at-large by all the qualified voters in the county.  See Fla. Const. Art. VIII, § 1(e) (county commission); Fla. Stat. § 124.01(2) (county commission); Fla. Stat. § 230.061(1) (school board); Fla. Stat. § 230.10 (school board).  A majority of the votes cast is necessary to avoid a runoff in the primary. See Fla. Stat. §§ 100.061, 100.091. There is no majority vote requirement for the general election. See Fla. Stat. §§ 100.181, 230.10.

---

[79]  Thus, any suggestion that racial polarization in the county was somehow caused by partisan politics, as the Fifth Circuit found was the case in LULAC, 999 F.2d at 831, would have no meaning here.

Prior to 1996, there had been four black candidacies for countywide elected office in Liberty County. Black candidates for seats on the school board included Charles Berrium in 1968, and Earl Jennings in 1980 and 1984. In 1984, Gregory Solomon ran for a seat on the county commission. None of these black candidacies was successful. *Findings* at 3.

However, in September of 1990, Earl Jennings ran for a seat on the Liberty County Commission, defeating a white opponent in the Democratic primary election and a white incumbent county commissioner in the general election. See *Defs.' Ex.* 4A (*from 1991 Trial*). In 1992, Mr. Jennings received the highest vote total in the Democratic primary, running against three white opponents. In the 1992 runoff election, Mr. Jennings defeated the white candidate, Willis (Jack) Brown, who was the second-highest vote-getter in the primary. As there was no Republican opposition, Mr. Jennings retained his seat in the runoff election. See *Stanley Aff.*, Doc. 133. In 1996, Mr. Jennings ran for reelection against two black opponents and one white opponent. In the September 3, 1996 Democratic primary, Mr. Jennings received more votes than the other candidates, but did not receive over fifty percent of the vote. In the October 1, 1996 runoff, Mr. Jennings again defeated Mr. Brown, receiving a higher vote total in seven of Liberty County's eight precincts and in the absentee ballots. As there was no Republican opposition, Mr. Jennings retained his District 1 seat with this victory. See *Stanley Aff.*, Doc. 148. Aside from those

82

individuals who ran against Mr. Jennings, there is no other
record evidence of black candidacies for County Commission or
School Board seats since the initial trial of this matter in
1986.

**B.   The Senate Factors:**

Both the trial presentation, post-trial submissions, and
additional evidence submitted after remand conformed
substantially to the structure of those "typical factors"
enumerated in the Senate Report.  This Court's findings will be
similarly structured.  In the process of making its findings, the
Court will address some of the specific questions raised by Judge
Tjoflat in his original panel decision [see Solomon, 865 F.2d at
1566, vacated, 873 F.2d at 248] and specially concurring opinion
[see Solomon, 899 F.2d at 1037 n.14 (Tjoflat, C.J., specially
concurring)].

**1.   History of Official Discrimination Against Blacks:**

The first Senate factor dictates a study of "the extent of
any history of official discrimination in the state or political
subdivision that touched the right of the members of the minority
group to register, to vote, or otherwise to participate in the
democratic process."  *S. Rep.* at 28, 1982 U.S.C.C.A.N. at 206.
See, e.g., McMillan v. Escambia County, 748 F.2d 1037, 1043-44
(5th Cir. 1984)[80]; Morengo County, 731 F.2d at 1567 & n.36.

---

[80]   Former Fifth Circuit case, applying Section 9(1) of Public
Law 96-452.

Plaintiffs presented the expert testimony of Dr. Jerrell
Shofner[81] to establish a long history of extensive official
discrimination in Florida, and in Liberty County in particular.
Defendants concede that Plaintiffs have proven the existence of
past discrimination.  See Doc. 149 at 12; 1986 Tr., Doc. 77 at 6.
Nevertheless, the Court will discuss the specific instances of
official discrimination in Liberty County, as well as the extent
to which that discrimination still affects the rights of blacks
to have equal access to the political process.

Blacks in Liberty County suffered from many of the same
types of repugnant discriminatory practices in the political
process that were employed throughout most of Florida and the
South.  Until as recently as the 1960s, all political appointees
in the county were white.  All the juries were white.  Only
whites could be members of the Democratic party and nominate the
Democratic party nominees in the primaries until the Supreme
Court struck down such practices in the 1940s.  Poll taxes were
successfully used to prevent most blacks from voting.  Lynchings
and intimidation of black voters were prevalent.  Even when
blacks were allowed to vote, the use of mechanisms such as the
eight ballot box law, whereby a vote would only count if it was
placed in the correct ballot box for a particular candidate, made
voting an exercise in futility.  During the civil rights movement
in the early to-mid 1960s, the supervisor of elections used a

---

[81]   At the time of the 1986 trial, Dr. Schofner was a professor
of history and chairman of the history department at the University
of Central Florida.  Schofner Test., 1986 Tr., Doc. 82 at 3.

"slow-down" process to delay voter registration by blacks in the
county.  See Schofner Test., 1986 Tr., Doc. 82 at 26-34, 42-43,
47-48.[82]  All of these acts of discrimination had their intended
effect in Liberty County:  in 1956, there was only one registered
black voter, and from 1958 until 1962, there were no registered
black voters.  By comparison, in 1966 there were 177 registered
black voters, and in 1968 there were 210 registered black voters
in Liberty County.  See Pls.' Ex. 26.[83]

    Jim Crow laws and an official policy of separation were
similarly employed to a large degree in Liberty County.  Dr.
Schofner described the extent of this discrimination:  "Separate
ticket windows.  Separate waiting rooms in all public
transportation facilities. . . Separate railroad cars.  Separate
chain gangs. . . . It went about as far as it could be conceived
. . ."  Schofner Test., 1986 Tr., Doc. 82 at 31.

    Furthermore, a pervasive official policy of discrimination
and segregation in education was present in Liberty County.  A
dual school system was adopted.  See Pls.' Ex. 6.  But separate
was anything but equal.  In the early 1930s, when blacks made up
about one third of the county's population, the county spent
$11,825.00 for white schools and only $1,520.00 for black

---

[82]    Many of the Plaintiffs' exhibits are also replete with
references to official discrimination in the political process.
See, e.g., Pls.' Exs. A and 5 (county commission minutes); Pls.'
Exs. C-D and 1-2 (newspaper articles).

[83]    During this same time period, blacks comprised between
fourteen and eighteen percent of the total population.  See Pls.'
Ex. E, Fact 1.

schools. Id. at 36; Pls.' Ex. A, Fact 94. Black schools were
without hygienic facilities as late as 1947. After the Supreme
Court's 1954 mandate in Brown v. Board of Education, there was
widespread organized resistance to integration in the county.
Schofner Test., 1986 Tr., Doc. 82 at 44-45. For example, in
1956, a meeting of the Liberty County Citizens Council was to be
held for all white citizens, eighteen years and older, "to keep
this [integration] from happening." Pls.' Ex. C, Fact 17.
Integration occurred very slowly in the county, and the schools
were not desegregated until 1968. At that time, the black school
was closed and blacks were put in the white schools. Schofner
Test., 1986 Tr., Doc. 82 at 47-48.

Several lingering effects of Liberty County's sad history of
racial discrimination remain in the present. To a great extent,
the county is still racially segregated. Blacks and whites
attend separate churches. Civic groups such as the Bristol Lions
Club and the Liberty County Chamber of Commerce do not have any
black members. See Pls.' Exs. 21-22; Solomon Test., 1986 Tr.,
Doc. 78 at 40-45; Eubanks Test., 1986 Tr., Doc. 79 at 11-21;
Beckwith Test., 1986 Tr., Doc. 80 at 6-7; Brinson Test., 1986
Tr., Doc. 80 at 25. Another civic organization, the Farm Bureau,
apparently only had one black member at the time of the 1986
trial. See Brinson Test., 1986 Tr., Doc. 80 at 24.[84] Blacks

---

[84]   Although these churches and organizations remain
segregated, there are no barriers to blacks becoming members.
Eubanks Test., 1986 Tr., Doc. 79 at 28-29. The black witnesses who
testified at trial about these organizations indicated that they
had never sought membership in them. Solomon Test., 1986 Tr., Doc.

largely live together in one part of the county, the northwestern
quadrant, geographically separated from whites scattered
throughout the remainder of the county.  As is discussed later
on, there are also significant socio-economic disparities between
white and blacks in Liberty County.

There was some testimony about continuing acts of official
discrimination within Liberty County.  Plaintiff Solomon
testified that while blacks had access to the local high school
for community activities, "they don't feel comfortable using it."
*Solomon Test.*, *1986 Tr.*, Doc. 78 at 52-53.  He also stated that
there had been two instances in the high school where a black
girl obtained the largest number of votes for the junior
sweetheart pageant, but the school officials allowed the vote to
be diluted to ensure that a white girl won instead.[85]  Id.
Finally, many witnesses discussed Stallworth v. Schuler, 777 F.2d
1431 (11th Cir. 1985) [see *Pls.' Ex.* 25], a Title VII action in
which a black school teacher proved he was consistently denied
administrative positions and principalships by the Liberty County

_____

78 at 57-58, 69; *Beckwith Test.*, *1986 Tr.*, Doc. 80 at 6.  Plaintiff
Solomon indicated that he had attended white churches and had not
had any problems.  *Solomon Test.*, *1986 Tr.*, Doc. 78 at 58.

[85]   The testimony of Dr. Charles Billings, an associate
professor of political science at Florida State University,
indicated that although "there are lingering effects of a history
of segregation, . . . [the] Liberty County School, as far as the
student body is concerned, is making . . . progress . . . ."
*Billings Test.*, *1986 Tr.*, Doc. 77 at 46-47.

School Board because of his race.[86]

Notwithstanding the remaining vestiges of official discrimination in Liberty County, there is no evidence that the ability of blacks to participate in the political process has been hindered by that discrimination.  Plaintiffs attempted to establish civic organizations, such as the Lion's Club and Chamber of Commerce, serve as political forums for white candidates.  However, the more credible evidence is to the contrary.  See *Eubanks Test.*, *1986 Tr.*, Doc. 79 at 12, 68; *Burke Dep.*, *Pls.' Ex.* K at 13-14; *Johnson Dep.*, *Pls.' Ex.* M at 10-11; *Sanders Dep.*, *Pls.' Ex.* N at 18-21.  Black candidates have been invited to speak at all of the Democratic party political rallies.  *Solomon Test.*, *1986 Tr.*, Doc. 78 at 84.  Two blacks, Emmanuel Solomon and Queen Ester Solomon, are members of the Executive Committee of the Liberty County Democratic Party. *Eubanks Test.*, *1986 Tr.*, Doc. 79 at 27-31; *Johnson Dep.*, *Pls.' Ex.* L at 19.  But perhaps most telling of all is that every witness who spoke on this point concluded that there are no blocks to the political process arising from past or present acts of official discrimination.[87]  See *Billings Test.*, *1986 Tr.*,

---

[86]   The Court agrees with Dr. Billings' statement that while the Stallworth decision "indicate[s] lingering prejudice on the part of whites even in their official capacity . . . it did not touch the issues involved in a determination of whether the Voting Rights Act is being violated." *Billings Test.*, *1986 Tr.*, Doc. 77 at 45.

[87]   Plaintiff Solomon indicated that the only effort made to keep blacks from qualifying to run for elective office was "just economics." *Solomon Test.*, *1986 Tr.*, Doc. 78 at 73.

Doc. 77 at 33-34, 44; *Eubanks Test.*, *1986 Tr.*, Doc. 79 at 68-69;
*St. Angelo Test.*, *1986 Tr.*, Doc. 81 at 212-14, 218-22, 235, 241;
*Schofner Test.*, *1986 Tr.*, Doc. 82 at 88-90, 103-04.  The Court
agrees.

### 2.  Degree of Racially Polarized Voting:

The second Senate factor requires the Court to examine "the
extent to which voting in the elections of the state or political
subdivision is racially polarized." *S. Rep.* at 29, 1982
U.S.C.C.A.N. at 206.  The Eleventh Circuit found, as a matter of
law, that Plaintiffs had established widespread racial bloc
voting in Liberty County.  See Solomon, 899 F.2d at 1013; id. at
1020-21 (Kravitch, J., specially concurring); id. at 1037
(Tjoflat, C.J., specially concurring) (citing to Solomon, 865
F.2d at 1574, 1579-81).[88]  Since this cause was remanded,
neither party has introduced any additional evidence on this
Senate factor.[89]  Thus, the Court must hold that there is a high
degree of racially polarized voting in Liberty County.

### 3.  Enhancing Factors:

---

[88]  Of the sixteen elections analyzed by Dr. St. Angelo, a
significant degree of racial polarization was found in all but one,
Earl Jennings's election in the second primary of 1980.  See also
*St. Angelo Test.*, *1986 Tr.*, Doc. 81 at 163; *Pls.' Ex.* 17.

[89]  Obviously, if Defendants had bothered to perform a
bivariate ecological regression analysis of Earl Jennings'
elections in 1990, 1992, and 1996, the Court suspects that they
would have shown a significantly reduced degree of racially
polarized voting.  In all three of these elections, Jennings
undoubtedly needed a substantial amount of white cross-over vote to
win his county commission seat.  See *Defs.' Ex.* 4A (*from 1991
Trial*); *Stanley Aff.*, Doc. 133; *Stanley Aff.*, Doc. 148.  However,
absent a proper statistical analysis, the Court can give no weight
to such speculation.

"A vote dilution case 'is enhanced by a showing of the existence of large districts, majority vote requirements, anti-single shot voting provisions and the lack of provision for at-large candidates running from particular geographical subdistricts.'" *Marengo County*, 731 F.2d at 1570 (quoting *Zimmer*, 485 F.2d at 1305).

Liberty County presents a vast area to cover in an at-large campaign. Liberty County is comprised of 836 square miles, with a population density of seven people per square mile. The county has a population that is the second-smallest of any Florida county (behind only Lafayette), and it has the lowest level of population density. The town of Bristol, the county seat, is the largest municipality with a 1990 population of 937. BARBARA B. LAFRENIERE & EDWARD LAFRENIERE, THE COMPLETE GUIDE TO LIFE IN FLORIDA 398 (1995-96 ed.) (*hereinafter* "FLORIDA"). The remainder of Liberty County's population is located in a number of other small communities such as Hosford and Sumatra, and in a large tract of unincorporated area. Many witnesses testified that much of the campaigning in Liberty County is done by going "from household to household, door to door." *Sanders Dep., Pls.' Ex.* N at 16. See also *Solomon Test., 1986 Tr.*, Doc. 78 at 46-47; *Free Dep., Pls.' Ex.* J at 8; *Burke Dep., Pls.' Ex.* K at 12. 17-18; *Johnson Dep., Pls.' Ex.* L at 16-17; *Johnson Dep., Pls.' Ex.* M at 9-10. As a result, the lower economic status of blacks in Liberty County [see discussion of socio-economic disparities, *infra*] could cause blacks to have a greater difficulty campaigning. For instance,

Plaintiff Solomon stated that while he attended a political rally in Sumatra, he could not afford to campaign house to house there "due to the distance and the small number of voters in that precinct." *Solomon Test.*, *1986 Tr.*, Doc. 78 at 49, 83-84. However, this campaign disadvantage is offset somewhat by the fact that voters within Liberty County are very active in politics, and generally attend one or more of the political rallies held in Bristol, Hosford, and Sumatra.[90]

For both the Liberty County Commission and Liberty County School Board elections, there is a majority vote requirement to win the party nomination but not the general election. See Fla. Stat. §§ 100.061, 100.091, 100.181, and 230.10. The existence of this mechanism can operate in a manner that dilutes the minority black vote in Liberty County. Prior to the election of Earl Jennings as a county commissioner and his two subsequent reelections, the elections data submitted by Plaintiffs indicated the following general pattern: black candidates would frequently get past the first primary by receiving enough votes to make the run-off, only to lose in the second primary when white voters voted as a bloc against the black candidate. See *Pls.' Exs.* 4 & B. Earl Jennings' elections are contrary to this historical trend, since in each instance Mr. Jennings received the greatest number of votes in the primary and then went on to be elected in

---

[90] John Sanders testified that during the 1982 campaign, around four or five hundred people attended the candidate forum at Hosford, and "about the same number" attended the forum at Bristol. *Sanders Dep.*, *Pls.' Ex.* N at 19.

either the second primary (when there was no Republican opponent) or the general election. See Defs.' Ex. 4A (from 1991 Trial); Stanley Affs., Docs. 133 & 148. Nonetheless, the Court finds that the historical pattern provides ample proof that the continued use of a majority vote requirement can work to the detriment of black candidates.

Commission and school board candidates must run for one of five numbered seats corresponding to the district in which they reside. Because of this requirement, an anti-single shot provision is irrelevant. Marengo County, 731 F.2d at 1570-71 n.45. Similarly, "the lack of provision for at-large candidates running from particular geographical subdistricts" is inapplicable.

The Senate Report states that "other voting practices or procedures" may also enhance the possibility for discrimination against a minority group. S. Rep. at 29, 1982 U.S.C.C.A.N. at 206. There was a great deal of evidence of voting irregularities in Liberty County. Plaintiffs submitted a copy of the Supreme Court of Florida's decision in Bolden v. Potter, 452 So. 2d 564 (Fla. 1984), wherein all absentee ballots cast in a Liberty County School Board election in 1978 were invalidated due to extensive absentee vote buying.[91] See Pls.' Ex. 15; St. Angelo Test.,

---

[91] One witness, Johnny Eubanks, also testified that vote buying is not as pervasive as it was in 1978, but that it is still "a regular occurring thing" in Liberty County. Eubanks Test., 1986 Tr., Doc. 79 at 45-46. However, Mr. Eubanks later indicated that he did not know of any present elective process that "prevents or impedes fair and impartial access to the political process [for] blacks." Id. at 69. Based upon this statement, and the fact that

*1986 Tr.*, Doc. 81 at 124-26.  Dr. St. Angelo stated that there
was a practice in Liberty County whereby people who "have
formerly lived in the county but moved out of the county, were
permitted to vote in the county even though their residence may
not be in the county."[92]   *Id.* at 126-27, 152-53.  However, Edna
Davis, the Supervisor of Elections for Liberty County, testified
that in the early 1980s, she purged nearly 600 out-of-county
voters --- and that non-residents were no longer permitted to
vote in county elections.  *Davis Test.*, *1986 Tr.*, Doc. 80 at 3-4.
The Court agrees with Dr. St. Angelo on two points concerning
these irregularities: first, the adoption of single-member
districts would not prevent such voting fraud; second, voting
fraud tends to work against the black community.[93]   *See St.
Angelo Test.*, *1986 Tr.*, Doc. 81 at 129-30, 211.  However, the
more credible evidence shows that voting irregularities are not
part of the present political reality in Liberty County.

    In summary, the Court finds that only the majority vote
requirement, and to a much lesser extent the size of Liberty

---

there is no other evidence showing the continued presence of vote
buying in Liberty County, the Court concludes that voting buying
does not exist in a manner sufficient to enhance discrimination
against blacks.

    [92] The tables submitted by Plaintiffs shows that this practice
was clearly present in 1980, when white voters were registered at
a rate of 110 percent of their voting age population.  *See Pls.'
Ex.* 20, Table 4.

    [93]   On the other hand, Dr. St. Angelo stated that this
statement was not true of white candidates trying to buy the black
vote "when these folks [the black voters] close the curtain, they
vote as part of the black community."  *St. Angelo Test.*, *1986 Tr.*,
Doc. 81 at 154.

County, can enhance the possibility of discrimination against
black voters in Liberty County.  No other voting practices or
procedures were sufficiently proven to exist or to otherwise have
a discriminatory impact upon blacks in the county.

### 4.   Candidate Slating Process:

"In jurisdictions where there is an influential official or
unofficial slating organization, the ability of minority
candidates to participate in that slating organization and to
receive its endorsement may be of paramount importance."  *Marengo*
*County*, 731 F.2d at 1569.  There is no official slating
organization in Liberty County.  *Eubanks Test., 1986 Tr.*, Doc. 79
at 22-23, 62.  On the other hand, the county has a very informal,
unofficial candidate slating process.  "Much of the politics of
Liberty County is based on family membership. . . . [or]
contacting heads of families."  *St. Angelo Test., 1986 Tr.*, Doc.
81 at 157.  A number of large white families, including the
Burkes, Hosfords, Johnsons, Revells, Shulers, Stricklands and
Summers [see *Solomon Test., 1986 Tr.*, Doc. 78 at 62-63, 87;
*Eubanks Test., 1986 Tr.*, Doc. 79 at 26-27, 37-38], are very
active in local politics, and generally select one of their own
family members or acquaintances who are politically aligned with
them to run for office.  *Billings Test., 1986 Tr.*, Doc. 79 at 6-
7.  There is a great deal of "horse-trading" in this process.
Family factions will promise to support candidates of other

factions, in exchange for support of their candidates.[94]

*Solomon Test.*, *1986 Tr.*, Doc. 78 at 50; *Eubanks Test.*, *1986 Tr.*,

Doc. 79 at 33.  Occasionally, support will be gained in exchange

for patronage; that is, appointment to a county position will be

promised to a faction member by a successful candidate.  Id. at

51.  Other times, families will join together to pursue common

political goals.  Id. at 24.  The family alliances developed

through this slating process are very fluid and change from

election to election.  Id. at 24-25, 62, 64.  In order for

candidates to be successful in Liberty County, they must align

themselves with one or more family groups.  Id. at 25; *Solomon*

*Test.*, *1986 Tr.*, Doc. 78 at 49.

The greater weight of evidence indicates that blacks have

not been excluded from Liberty County's informal slating process.

Plaintiff Solomon stated that he was not asked to align with a

slate of candidates.[95]  Id. at 50, 63, 77.  However, Plaintiff

Solomon also testified that Jennings had been in a lineup in his

----

[94]  However, this process is not always successful.  Sometimes
different family members pledge the family's support to several
candidates in the same race.  This "double crossing," as one
witness referred to it, frequently results in election day
surprises --- with no one knowing which candidates were supported
by particular families until after all the election results are all
in.  *Eubanks Test.*, *1986 Tr.*, Doc. 79 at 24, 33-34, 52-54, 61-62.

[95]  Conversely, Plaintiff Solomon also testified that he was
promised support by the Hosfords and other family factions --- and
if he had actually received the support promised to him, he would
have been elected.  *Solomon Test.*, *1986 Tr.*, Doc. 78 at 78.  This
testimony seems to indicate that Plaintiff Solomon may have been
initially included on a particular candidate slate, only to be a
victim of last minute "double crossing," with family members
changing their minds when they actually cast their ballots.

1980 campaign for the school board, and that this particular lineup had failed to achieve its goal of defeating the incumbent Hornsby.[96]  Id. at 63-65.  Dr. Billings provided similar testimony.  *Billings Test., 1986 Tr.*, Doc. 77 at 43.  At the 1991 retrial, there was no credible evidence which contradicted Dr. Billings' testimony that Earl Jennings appeared on a successful candidate slate in the 1990 county commission election.[97]

---

[96]  Judge Tjoflat suggested in the initial panel decision that "Earl Jennings, although black, may not have been perceived as a black candidate."  Solomon, 865 F.2d at 1581 & n.32.  Results of the 1980 first primary school board election indicate that Mr. Jennings probably was not the candidate of choice of the black community.  Mr. Jennings only received 21.1 percent of the vote of precinct 1, which was 58.05 percent black, and 51.09 percent of the vote of precinct 2, which was 56.92 percent black.  Cf.  *Pls.' Ex.* B, Facts 11 & 26.  At the same time, however, this data also makes it unclear that the black community had any candidate of choice in that election.  Cf. id.  Turnout in the first primary was 78.86 percent.  *Pls.' Ex.* B, Fact 26.

On the other hand, turnout and registration data for the 1980 second primary school board election demonstrate that Mr. Jennings was the black candidate of choice in precinct 2, where he received 66.66 percent of the vote, and that he may have been the candidate of choice in precinct 1, where he received 39.77 percent of the vote (the data in precinct 1 is less conclusive because there is not as strong a correlation between the number of votes Mr. Jennings received, as compared to the percentage of blacks in that precinct).  Turnout in the second primary was also high, at 72.01 percent of registered voters.  See *Pls.' Ex.* B, Fact 27.

The Court finds, based upon the foregoing, that the slating of Earl Jennings in the 1980 election is not enough by itself "to permit that the candidate slating process in Liberty County is open to blacks."  Solomon, 865 F.2d at 1582.

[97]  It is also apparent that Earl Jennings had access to the slating process in his 1992 and 1996 reelection campaigns.  As discussed above, the evidence shows that candidate slating is essential to a successful campaign in Liberty County.  Therefore, there can be little question that Mr. Jennings must have received the support of at least some of family factions in order to be elected.

*Billings Test.*, *1991 Tr.* at 52.   Based on this evidence, the
Court finds that Plaintiffs have failed to establish that blacks
have been denied access to Liberty County's informal candidate
slating process.

### 5.   Present Socio-Economic Effects of Past Discrimination:

"Past discrimination may. . . lead to present socioeconomic
disadvantages, which in turn can reduce participation and
influence in political affairs." <u>Marengo County</u>, 731 F.2d at
1567.   Thus, under the fifth Senate factor, the Court must
consider two matters:   first, whether blacks in Liberty County
suffer present socio-economic effects of past discrimination; and
second, whether those effects actually "hinder their ability to
participate effectively in the political process." *S. Rep.* at
29, 1982 U.S.C.C.A.N. at 206.

---

Furthermore, in all three county commission elections (1990,
1992, and 1996), Mr. Jennings was, overall, the black candidate of
choice.   In 1991, blacks comprised 46.09 percent of the registered
voters in residential district 1.   <u>See</u> *Defs.' Ex.* 2A (*from 1991
Trial*).   In the 1990 election, Mr. Jennings received 75.52 percent
of the votes cast in district 1 in the first primary, and 76.81
percent of the votes cast in district 1 in the general election.
<u>See</u> *Defs.' Ex.* 4A (*from 1991 Trial*).   In the 1992 election, Mr.
Jennings received 55.84 percent of the votes cast in district 1 in
the first primary (a figure less conclusive of black support), and
72.04 percent of the votes cast in district 1 in the second
primary.   <u>See *Stanley Aff.*</u>, Doc. 133.   In the 1996 election, black
support in the first primary was apparently divided between the
three black candidates (Mr. Jennings received 24.06 percent of the
vote in residential district 1, compared to 52.83 percent for
Stafford Stanley Dawson and 12.26 percent for Helen Hall), but was
squarely behind Mr. Jennings in the second primary when he garnered
73.02 percent of the votes cast in district 1.   <u>See *Stanley Aff.*</u>,
Doc. 148.   Based on the Court's finding that Mr. Jennings was the
candidate of choice of the black community in these elections, it
is clear that an inference can be created "that the candidate
slating process in Liberty County is open to blacks." <u>Solomon</u>, 865
F.2d at 1582.

Liberty County has been described as retaining its
"'frontier, primitive and rural sameness,' while those who live
[there] are characterized as 'slow-speaking, rugged individuals
who boast of their rural Southern roots and their robust
living.'"   FLORIDA at 398 (citation omitted).   "Blacks and whites
are not as well off in Liberty county as other counties in
Florida and other counties in the United States."   *St. Angelo
Test.*, *1986 Tr.*, Doc. 81 at 120.   In 1990, the average per capita
income for residents of Liberty County was $11,500, one of the
lowest averages in Florida.   See CENSUS at 312.   Thirty-eight
percent of all residents had total incomes amounting to 125
percent or less of the poverty level.   Id. at 320.   "Between 60
and 70 percent of all the residents. . . pay no property taxes
because their homes are evaluated at less than $25,000 [the
amount of Florida's homestead exemption]."   *Billings Test.*, *1986
Tr.*, Doc. 77 at 68.   There are few professional or skilled jobs.
The timber industry employs the largest percentage of people in
the county.   *St. Angelo Test.*, *1986 Tr.*, Doc. 81 at 133-34;
FLORIDA at 399.

Dr. St. Angelo testified that notwithstanding the generally
depressed economic conditions in Liberty County, the 1980 census
data showed that "blacks trail whites by a significant amount" in
most respects.   *St. Angelo Test.*, *1986 Tr.*, Doc. 81 at 120.   See
also *Pls.' Ex.* E & 3 (summarizing 1980 census data for the
county).   Results of the 1990 census support this conclusion.
Blacks are employed to the same extent as whites in the county

*98*

[see CENSUS at 351], but blacks make less money than whites. While the average per capita income for whites in the county is $13,127, the average per capita income for blacks is only $3,935. Id. at 312. The mean household income for whites in the county is $27,489, compared to a mean household income of $14,857 for blacks. Id. at 306. Ownership rates for homes is comparable between whites and blacks [see id. at 125, 143], but blacks tend to live in lower quality homes under more squalid conditions.[98] Over one quarter of all blacks' households lack the use of a motor vehicle, compared to 7.2 percent of all whites' households. Id. at 191, 408. Blacks are also behind whites in education. Nearly 52 percent of all blacks in the county over the age of 25 do not have a high school diploma, compared to 41 percent of all whites. Only 5 percent of blacks have some type of college degree, in contrast to almost 13 percent of all whites. Id. at 250. This evidence conclusively demonstrates that blacks in Liberty County continue to suffer from the present socio-economic effects of past discrimination.

However, the evidence does not indicate that black political participation has been hindered by socio-economic disparities. Indeed, the opposite is true. Voter registration is very high in Liberty County, and since 1981, when the registration books were purged for the first time in several years, black registration

---

[98] Census data is not available for blacks for many of the characteristics of their occupied housing units. See CENSUS at 191. But one example demonstrates the Court's point. While 1.8 percent of white residents' homes have inadequate plumbing, 6.2 percent of black residents' homes are in that condition. Id.

percentage has exceeded white registration percentage.  At the
time of the 1986 trial, several witnesses stated that
approximately 73 percent of blacks of voting age were registered
to vote in the county, compared to a little less than 67 percent
of all whites of voting age.  *Billings Test., 1986 Tr.*, Doc. 77
at 34-35, 40; *St. Angelo Test., 1986 Tr.*, Doc. 81 at 212-15;
*Schofner Test., 1986 Tr.*, Doc. 82 at 87-88.  Black voter turnout
was also said to be "uniformly high."  *Billings Test., 1986 Tr.*,
Doc. 77 at 69.  There has been no evidence presented since the
1986 trial to suggest that these registration and turnout figures
are any different today.

Plaintiffs contend that evidence showing few blacks have run
for political office in Liberty County[99] suggests lack of access
to the political process.[100]  Plaintiff Solomon stated that
economics explain why blacks cannot run for office:  "Blacks
generally don't hold positions which enable them to make the
money to pay the qualifying fee and they can't afford to qualify
for the elections."  *Solomon Test., 1986 Tr.*, Doc. 78 at 73.  The
record belies Plaintiff Solomon's testimony.  There is simply no
evidence that any black has been discouraged from running for
office because of the existence of a qualifying fee.  Plaintiff
Solomon himself was able to raise the money needed to run for

---

[99]  As stated earlier, at the time of the 1986 trial, only
three blacks had run for political office in Liberty County.

[100]  The Court concurs with Dr. Billings that the act of
running for office is "an act of political participation."
*Billings Test., 1986 Tr.*, Doc. 77 at 70.  See also *Eubanks Test.,
1986 Tr.*, Doc. 79 at 42 (same).

office.  Id. at 45, 58-59; St. Angelo Test., 1986 Tr., Doc. 81 at
220.  Furthermore, Plaintiff Solomon testified that he found out
after he had paid the qualifying fee that he could have avoided
paying the qualifying fee by signing a pauper's affidavit or by
filing a petition with a certain number of signatures of
registered voters in the county.  Solomon Test., 1986 Tr., Doc.
78 at 58-59.  Finally, the most persuasive evidence that the
qualifying process does not interact with economics in a manner
that excludes black participation is the number of black
candidacies since 1986.  Earl Jennings has run three successful
candidacies, including a reelection campaign in 1996 against two
other black candidates.  See Defs.' Ex. 4A (from 1991 Trial);
Stanley Affs., Docs. 133 & 148.

     Income disparities between blacks and whites could make it
more difficult for black candidates to run effective campaigns.
However, the nature of Liberty County politics does not seem to
demand great financial expenditures.  As the Court has already
discussed, the predominant campaign approach in the county is
door-to-door solicitation of support.  The far-flung nature of
the county's population in unincorporated areas may work against
less affluent black candidates.  But this disadvantage is largely
offset by the fact that the local Democratic Executive Committee
has sponsored well-attended rallies to which all candidates were
invited and which the black candidates attended.  Moreover,
blacks who have actually run for office have been "at least as
affluent as most of the white candidates."  Billings Test., 1986

Tr., Doc. 77 at 44.  In light of this evidence, and the testimony of Plaintiffs' own expert that blacks do not face any obstacles in their campaigning [*St. Angelo Test., 1986 Tr.*, Doc. 81 at 221], the Court finds that the lingering effects of past discrimination do not hinder political campaigning by blacks.

The evidence in this case indicates the presence of significant socio-economic disparities between whites and blacks in Liberty County, and the Court recognizes that such disparities often affect access to the political process.  Nevertheless, blacks voters in Liberty County are not actually hindered in registering, casting ballots, qualifying to run, and campaigning for public office.  The greatest obstacle to effective black participation in the political process has been a lack of knowledge of the dynamics of running effective campaigns.[101] Therefore, the Court finds that there is no significant impediment to black political participation in Liberty County arising from the present socio-economic effects of past discrimination.

---

[101]    There are a few different examples of this lack of knowledge about the political process.   First, as noted above, blacks have frequently not known nor asked about alternatives to paying qualifying fees.    Second, Dr. St. Angelo testified that Plaintiff Solomon did not know that a voter registration list was available to assist candidates in targeting people who are more likely to vote.  *St. Angelo Test., 1986 Tr.*, Doc. 81 at 121-23.  In addition, as Plaintiff Solomon stated, "interrelat[ing] with the public. . . get[ting] to know the public" is also a big part of being electing to public office in the county. *Solomon Test., 1986 Tr.*, Doc. 78 at 73.   At the 1991 retrial, Dr. Billings testified that Earl Jennings's electoral success in 1990 resulted in large part from becoming more knowledgeable about the political process in Liberty County, and running "a very personal kind of campaign." *Billings Test., 1991 Tr.* at 50.

### 6.   Racial Appeals:

Another relevant factor is whether political campaigns have been characterized by overt or subtle racial appeals. *S. Rep*. at 29, 1982 U.S.C.C.A.N. at 207.  Plaintiffs have presented evidence of overt racial appeals in Liberty County during the 1956 presidential primary campaign, a 1956 state senate campaign, and a 1958 campaign for state legislature.  See *Pls.' Exs*. A & 1; *Schofner Test., 1986 Tr.*, Doc. 82 at 45.  In addition, Dr. St. Angelo testified that in the late 1960s and early 1970s, subtle racial appeals were made by some candidates for state-wide and presidential offices.  See *St. Angelo Test., 1986 Tr.*, Doc. 81 at 88-92.  However, there is no evidence that racial appeals have been made in any recent elections (within the last twenty-plus years) in Liberty County.  See *Billings Test., 1986 Tr.*, Doc. 77 at 43; *Billings Test., 1991 Tr.* at 64.[102]  The absence of racial appeals is not surprising because the small number of voters in the county [see *Billings Test., 1986 Tr.*, Doc. 77 at 61-62] dictates that candidates for office typically need the black vote in order to get elected.[103]  *Billings Test.*, Doc. 77 at 22-23; *Solomon Test., 1986 Tr.*, Doc. 78 at 73; *Eubanks Test., 1986 Tr.*,

---

[102]   Mindful of Judge Tjoflat's statement that evidence of racial appeals should be reconsidered on remand [Solomon, 865 F.2d at 1582], the Court responds by noting the testimony of Dr. Billings --- that there have been no such appeals in any recent elections --- was the only evidence presented on this issue.

[103]   Obviously, the use of racial appeals cuts both ways. Plaintiff Solomon indicated that a black candidate would be "foolish" to base his or her campaign on race. See *Solomon Test., 1986 Tr.*, Doc. 78 at 67-68.  Dr. Billings gave similar testimony. See *Billings Test., 1986 Tr.*, Doc. 77 at 36-39.

Doc. 79 at 59-60; *St. Angelo Test.*, Doc. 80 at 105.   The more
credible evidence shows that the citizens and candidates of
Liberty County believe that an election cannot be won without
black support.

Since there is no record evidence of any recent overt or
subtle racial appeals in campaigns in Liberty County, Plaintiffs
have failed to carry their burden of proof on this factor.

### 7.   Extent of Electoral Success:

Section 2 expressly states that a Court may examine "[t]he
extent to which members of a protected class have been elected"
in the jurisdiction.   42 U.S.C. § 1973(b).   Where there has been
some electoral success of a minority group, that finding does not
automatically defeat a vote dilution claim.   <u>See</u> *S. Rep.* at 29
n.115, 1982 U.S.C.C.A.N. at 207 n.115.   The Eleventh Circuit has
held that "[s]uch success might, on occasion, be attributable to
the work of politicians, who, apprehending that the support of a
black candidate would be politically expedient, campaign to
insure his election.   Or such success might be attributable to
political support motivated by different considerations ---
namely that election of a black candidate will thwart successful
challenges to electoral schemes on vote dilution grounds."
<u>Morengo County</u>, 731 F.2d at 1572.   <u>See</u> <u>also</u> <u>Gingles</u>, 478 U.S. at
57 & nn.25-26, 106 S. Ct. at 2770 & nn.25-26 (discussing special
circumstances to be considered in assessing minority electoral
success, such as the absence of an opponent, incumbency, or the
use of bullet voting).

*104*

At the time of the 1986 trial, no black had ever been elected to political office in Liberty County. See *Pls.' Exs.* B, 4, 10, 24, & 27; *Solomon Test., 1986 Tr.*, Doc. 78 at 56; *Eubanks Test., 1986 Tr.*, Doc. 79 at 39, 46-47; *St. Angelo Test., 1986 Tr.*, Doc. 81 at 114; *Schofner Test., 1986 Tr.*, Doc. 82 at 62. Since that time, Earl Jennings was elected at-large to a county commission seat from the first residential district, and has twice been reelected to office. See *Defs.' Ex.* 4A (*from 1991 Trial*); *Stanley Affs.*, Docs. 133 & 148. It is true that the Court must closely scrutinize the election of a minority following the onset of section 2 litigation. See Gingles, 478 U.S. at 76 & n.37, 106 S. Ct. at 2779 & n.37. However, there is no evidence of any special circumstances in this case which would require the Court to disregard Mr. Jennings' electoral success. Mr. Jennings was not elected until 1990, some five years after Plaintiffs filed this case and over four years after the first trial. The election results show that all of his elections were extremely competitive, with as many as four opponents (including both black and white candidates). There has been no suggestion nor proof offered by Plaintiffs that white officials or white voters in Liberty County have manipulated the electoral success of Mr. Jennings in order to defeat Plaintiffs' vote dilution challenge.

Thus, the Court holds that the more recent history of elections in Liberty County shows consistent electoral success by the black candidate of choice for public office. Sustained

electoral success, while not dispositive, obviously undercuts Plaintiffs' claims that blacks have been denied equal access to the political process in the county. Cf. Gingles, 478 U.S. at 77, 106 S. Ct. at 2780 ("[P]ersistent proportional representation is inconsistent with [an] allegation that the ability of black voters . . . to elect representatives of their choice is not equal to that enjoyed by the white majority.").

    8.   **Unresponsiveness of Elected Officials:**

    Lack of responsiveness of elected officials to the particularized needs of members of the minority community, although less important than other factors, may also be considered in evaluating a claim under section 2. See S. Rep. at 29, 1982 U.S.C.C.A.N. at 207 & n. 116; Morengo County, 731 F.2d at 1572. Without question, elected officials will probably be more responsive to the needs of the black community in jurisdictions where there are black officeholders. Dr. James Button[104], Plaintiffs' expert in minority politics, testified at length about such a correlation. See Button Test., 1986 Tr., Doc. 78 at 12-23, 31-32. But the absence of black officials in Liberty County at the time of the 1986 trial is not sufficient evidence by itself to find that elected officials are not responsive to the needs of the black community.

    The evidence shows that Liberty County School Board members have had some problems with sensitivity towards the black

---

[104]   At the time of the 1986 trial, Dr. Button was an associate professor of political science at the University of Florida. Button Test., 1986 Tr., Doc. 78 at 8.

community.  Many of these problems have already been addressed in
the section dealing with the extent of official discrimination in
the county.  For example, <u>Stallworth v. Schuler</u>, 777 F.2d at 1431
[<u>see</u> *Pls.' Ex.* 25] demonstrates a serious and significant example
of this lack of responsiveness on the part of the School
Board.[105]  In addition, Plaintiff Solomon cited an example where
black students asked him to teach a black history class, but the
school administrator refused to allow it because he did not like
the emphasis on *black* history.  *Solomon Test., 1986 Tr.*, Doc. 78
at 54-55.  Conversely, it appears that considering the small
number of blacks in Liberty County with college degrees, the
School Board has done an adequate job in the number of black
teachers it employs.  Other positions (aside from the
administrative positions which were denied to Mr. Stallworth)
also appear to be open to blacks.  <u>See</u> *Billings Test., 1986 Tr.*,
Doc. 77 at 31; *Solomon Test., 1986 Tr.*, Doc. 78 at 85.  There is
no record evidence of any racial discrimination by the School
Board since the <u>Stallworth</u> case, over nearly thirteen years ago.
Consequently, although the Liberty County School Board has a
mixed history of being sensitive to the needs of blacks in the
county, the more recent history suggests that school board
officials have become more responsive.

   The Liberty County Commission has a much better track record

_____

   [105]  During the <u>Stallworth</u> trial, there was testimony that "the
[black] plaintiff was not considered because his race would have
been a political liability for the school superintendent."  *St.
Angelo Test., 1986 Tr.*, Doc. 81 at 116, 199.  <u>See</u> <u>also</u> *Schofner
Test., 1986 Tr.*, Doc. 82 at 48-49 (same).

of responsiveness.  There was some testimony that many of the
streets in black communities in Liberty County are unnamed and
unpaved.  <u>See</u> *Solomon Test.*, *1986 Tr.*, Doc. 78 at 55.  On the
other hand, blacks have access to the same municipal and county
services that are available to whites.  <u>Id.</u> at 71-72.  Blacks
have filled county positions in percentages greater than or equal
to their percentage of the population.  Blacks have received
other benefits, including the bulk of grant money which was spent
on a water project and housing upgrades.  *Billings Test.*, *1986
Tr.*, Doc. 77 at 31-32, 42-43; *Solomon Test.*, *1986 Tr.*, Doc. 78 at
85-87.  Blacks have no problem approaching county commissioners,
and even those commissioners elected from other residential
districts (outside of residential district 1, where most blacks
are concentrated) listen to their complaints and are responsive
to their needs.  *Solomon Test.*, *1986 Tr.*, Doc. 78 at 71; *Beckwith
Test.*, *1986 Tr.*, Doc. 80 at 13-14; *Burke Test.*, *1986 Tr.*, Doc. 80
at 32.  This evidence satisfactorily establishes that the Liberty
County Board of County Commissioners has been responsive to the
black community.[106]

The Court holds that, with few exceptions, the Liberty
County School Board and County Commission have been responsive to
the needs of the black community.  This conclusion is
unremarkable considering the extent to which candidates for both

---

[106]    In fact, considering Dr. Button's testimony about the
correlation between responsiveness and the number of black elected
officials, it is likely that the Liberty County Commission has
become even more responsive to the needs of the black community
with the election of Earl Jennings.

offices campaign within the black community, the openness that
officials of both governmental bodies have exhibited towards
concerns of the black community, as well as the direct tangible
benefits that have flown from both governmental bodies into the
black community.  Any isolated instances of unresponsiveness by
elected officials in Liberty County do not hinder black access to
the political process.

     9.    **Tenuous State Policy:**

     Another factor which can be relevant in some cases is
whether the policy underlying the use of a voting practice or
procedure is tenuous.  *S. Rep.* at 29, 1982 U.S.C.C.A.N. at 207.
Judge Tjoflat described in great detail the changes in and
motivations for Florida's adoption of at-large systems for the
election of county commissioners and school board members.  See
Solomon, 865 F.2d at 1578-79.  See also *Findings* at 19-20.
Nevertheless, the Court will again discuss these changes in the
context of whether the policies underlying them are tenuous.

     Plaintiffs have failed to carry their burden of proving that
the policy behind at-large county commission elections in Liberty
County is tenuous.  Plaintiffs correctly conceded that there was
no racial motivation behind the 1900 amendment to the Florida
Constitution of 1885, which provided for at-large election of
county commissioners.  See McGill v. Gadsden County Commission,
535 F.2d 277, 280-81 & n.8 (5th Cir. 1976) (per curiam).
Apparently, Liberty County has elected its county commissioners
at-large in accordance with state law for at least 96 years.

Furthermore, even if there was a tenuous basis for the policy, the Florida Legislature, not Liberty County, was responsible for the maintenance of the policy until just before this litigation was commenced.

The policy behind the adoption of at-large school board elections is also not tenuous. There is little question that the Florida legislature's 1947 legislation allowing counties to adopt at-large districts for the election of school boards [see 1947 Fla. Laws 189-90, ch. 23726, §§ 5-9] was designed to dilute the voting power of the black community. See Shofner Test., 1986 Tr., Doc. 82 at 34-35. Accord NAACP v. Gadsden County Sch. Bd., 691 F.2d 978, 982 (11th Cir. 1982); McMillan v. Escambia County, 638 F.2d 1239, 1245-46 (5th Cir. 1981), cert. dismissed, 453 U.S. 946, 102 S. Ct. 17, 69 L. Ed. 2d 1033, vacated in part on other grounds, 688 F.2d 960 (5th Cir. 1982). However, the more credible testimony in the case at bar shows that notwithstanding the Legislature's racial animus, Liberty County was not similarly motivated when it changed its school board elections from single-member district elections to at-large elections.[107]   Dr. Charles

---

[107]   Plaintiffs' expert, Dr. Schofner, had testified that the Florida Legislature's purpose behind the 1947 change was to dilute the black vote.   Schofner Test., 1986 Tr., Doc. 82 at 34-35. However, Dr. Schofner also indicated that he was unaware of the details of how Liberty County changed to at-large school board elections. He did not know that Liberty County had maintained, by population act, single-member district elections for the school board until well into the 1950s. Furthermore, he did not realize that the purpose behind the change was to abolish corrupt ward politics. Id. at 97.

Billings and Mr. Johnny Eubanks[108] testified that Liberty County
made the change in approximately 1953. The adoption of at-large
school board elections resulted from a citizen's reform movement
in the county to abolish the existing ward-type political system.
The ward system had allowed a single family or faction to control
each district --- effectively disenfranchising other voters (who
at that time were all white), while furthering the special
interests of the family or faction at the expense of the rest of
the county. *Billings Test., 1986 Tr.*, Doc. 77 at 17-18; *Eubanks
Test., 1986 Tr.*, Doc. 79 at 54-56. Such a policy of reform to
eliminate factional politics is not tenuous.

Plaintiffs contend that notwithstanding the original reasons
for the adoption of at-large voting in Liberty County, the state
policy has now shifted in favor of single-member districts ---
and Liberty County's elections systems are contrary to that state
policy. The state's shift in policy is evidenced by the 1982
change from multi-member to single-member districts for the
Florida Legislature [see Fla. Stat. §§ 10.101-.103 (West 1988 &
Supp. 1997)], and the 1984 legislation which provides the option
of changing from what had been mandatory at-large elections to
single-member districts [see Fla. Stat. § 124.011 (county
commissioners); Fla. Stat. § 230.105 (school board members)].
However, the Court cannot agree with Plaintiffs' assertion. The
1984 legislation simply allows single-member districts, it does

---

[108] Mr. Eubanks is a long-time resident of Liberty County, and
publisher of THE LIBERTY JOURNAL, a local weekly newspaper. *Eubanks
Test., 1986 Tr.*, Doc. 79 at 8-9.

not mandate them.

Plaintiffs' argument implies that the continued maintenance of at-large voting in the face of the 1984 legislation necessarily dictates that the underlying policy must be tenuous. See Doc. 151 at 13-14. Such an implication is inconsistent with the evidence in the instant case. On September 4, 1990, Liberty County conducted a county-wide referenda election pursuant to Florida Statutes Sections 124.011 and 230.105, to determine whether single-member district elections should be adopted for county commission and school board elections. The voters in Liberty County rejected the county commission referendum by a vote of 376 (28.46 percent) for and 945 (71.54 percent) against single-member district elections. The voters in Liberty County rejected the school board referendum by a vote of 361 (27.43 percent) for and 955 (72.57 percent) against single-member district elections. See Defs.' Ex. 3A (from 1991 Trial). Using the same methodology employed by Dr. St. Angelo, Dr. Douglas Zahn[109] determined that 59.1 percent of the black voters voted against single-member districts for county commission elections, and 60.0 percent voted against single-member districts for school board elections. See Defs.' Ex. 5A (from 1991 Trial); Zahn Test., 1991 Tr. at 43-46. See also 1991 Tr. at 23 (Plaintiffs' counsel agreed with Dr. Zahn's statistical analysis). Obviously, the fact black and white voters in Liberty County

---

[109] At the time of the 1991 retrial, Dr. Zahn was employed as a professor of statistics at Florida State University. Zahn Test., 1991 Tr. at 42.

voted overwhelmingly against single-member districts, tends to undercut any suggestion that the continued policy of maintaining at-large elections for county commission and school board elections is somehow discriminatory or otherwise tenuous.[110]

Hence, the Court concludes as a matter of law that Plaintiffs have failed to establish that the policy underlying the use of at-large elections in Liberty County is tenuous.

C.  **Other Factors:**

The Senate Report states that while the Senate factors "will often be the most relevant ones, in some cases other factors will also be indicative of the alleged dilution." *S. Rep.*, at 29, 1982 U.S.C.C.A.N. at 207.  It is here that the Court should consider the extent of any racial bias in Liberty County.  In addition, pursuant to the mandate of DeGrandy, ___ U.S. at ___, 114 S. Ct. at 2647, the Court will discuss the extent to which blacks have achieved proportional representation in the Liberty County School Board and Liberty County Commission.[111]  The Court declines to address the black community's opposition to single-

---

[110]  Therefore, Judge Tjoflat's concerns with the state and county's reasons for retaining at-large elections is "of no moment."  Solomon, 865 F.2d at 1583.

[111]  In Harvell, the Eighth Circuit noted that in "address[ing] a claim involving a single at-large district [as is the case here], the analyses between proportionality and proportional representation are essentially the same."  71 F.3d at 1388 n.6. Cf. note 28, *supra* (discussing the differences between proportionality and proportionate representation in single-member districts).  In accordance with DeGrandy's mandate, the Harvell court went on to evaluate whether blacks had achieved proportionate representation in the at-large system being challenged.  See 71 F.3d at 1388-89.  The Court will conduct a similar analysis in the case *sub judice*.

member districts or the extent to which the black vote operates as a "swing vote," as it did in its earlier order [see *Findings* at 22-24], since Judge Tjoflat's opinions on appeal indicate that evidence has no relevance to the present section 2 inquiry. See Solomon, 865 F.2d at 1583-84.

### 1.   Racial Bias in the Voting Community:

Plaintiff Solomon was the only witness who presented any testimony about recent problems of racial animus in Liberty County. He first stated that the white superintendent of schools informed him that white people in the community had said they would not vote for Solomon because he was black. When Plaintiff Solomon attempted to secure white volunteers for his campaign he was unable to do so, and it was inferred that "they didn't want to be stigmatized by being associated with a black candidate and they had to live in the county. The way they put it, they would be labeled as a nigger lover if they were associated with me." *Solomon Test.*, *1986 Tr.*, Doc. 78 at 48-49. He also testified that while he was campaigning door to door, there were 10 to 12 homes where white people would not answer the door or would leave their door locked and ask him to put his campaign literature in the door. In one instance, "a little boy ran back and said, after he saw who it was, said 'There is a nigger at the door.'" Id. at 46-47, 59-60. In a few cases, people would not tie up their dogs when Plaintiff Solomon was campaigning. Id. at 70. In addition, he indicated that when he attended a campaign rally in Hosford, in the "Bluff" precinct, he "got something in the

air," "didn't feel real comfortable because a lot of candidates
didn't want to be seen talking to [him] or shaking [his] hand or
conversing with [him]," and "didn't read that as a warm
reception." Id. at 84.  Finally, Plaintiff Solomon opined that
racial prejudice must have caused him to lose his election
because he was "clearly the more qualified candidate."[112]  Id.
at 79.

On the other hand, much of Plaintiff Solomon's own testimony
cuts against the presence of racial bias within the voting
community.  Plaintiff Solomon stated that he was invited into
many white homes during his door to door campaigning, and white
candidates routinely campaign for election in the black
community.  Id. at 59.  Plaintiff Solomon did not know if white
candidates were invited into the homes of the 10 to 12 white
people who turned him away.  Id. at 61.  At all the other
political rallies he attended, Plaintiff Solomon indicated that
he received "warm" receptions.  Id. at 84.  Finally, Plaintiff
Solomon testified that voters in Sumatra, Hosford, Telogia, and
residential district 1 did not hold race against black candidates
"to a great degree."  Id. at 66, 82-83.

The testimony of other witnesses also indicates that there
is little racial animus within the voting community.
Preliminarily, it is worth restating the reason why the bivariate

---

[112]   Unfortunately, far too often the person elected to
political office is not the most qualified candidate.  Usually, it
is merely the person who is a better politician.  See Billings
Test., 1986 Tr., Doc. 77 at 47-48.

regression analysis conducted in this case is inappropriate in examining the presence or absence of racial bias: As Dr. St. Angelo stated, regression analysis shows that 15 out of 16 elections in Liberty County "were polarized along racial lines," but "that doesn't say anything about the relationships that people have with one another." *St. Angelo Test., 1986 Tr.*, Doc. 81 at 234. However, the other experts testified that all the qualitative data[113] they had gathered showed no evidence of racial animus in the county. See *Billings Test., 1986 Tr.*, Doc. 77 at 43; *Schofner Test., 1986 Tr.*, Doc. 82 at 85. At the 1991 retrial, Dr. Billings stated that there was no evidence of racial bias in the 1988 and 1990 elections. See *Billings Test., 1991 Tr.* at 64. The lack of overt or subtle racial appeals in campaigns is consistent with the lack of racial animus in the voting community.

Giving proper weight to all of the evidence, the Court must conclude that Liberty County is not driven by racial animus in the electoral process. There is certainly some evidence to the contrary, but this evidence appears to be demonstrative of the fact that a few individuals --- and not the community as a whole --- continue to cling to discriminatory beliefs and practices. The absence of racial bias does not defeat Plaintiffs' section 2 claim, but merely indicates that no circumstantial evidence of discriminatory results exists under this factor. See Johnson v. DeSoto County Bd. of Commissioners, 72 F.3d at 1564-65, discussed

---

[113]   See *supra* note 50.

*supra* Section I(C)(1)(b).  In other words, the lack of racial
animus does not cancel out the proof provided under the other
factors.  The Court may simply consider this as additional
evidence suggesting that blacks are not denied equal access to
the political process in Liberty County.

   **2.   Extent of Proportional Representation:**

   Proportionality, while not dispositive of a section 2 claim,
is a relevant factor which should be examined under the totality
of the circumstances.  DeGrandy, ___ U.S. at ___, 114 S. Ct. at
2651.  The proportionality inquiry is very straight forward in
this case.

   Blacks have not achieved proportional representation on the
Liberty County School Board.  Not only is there no black
currently serving on the school board, no black has ever served
on the school board.

   The opposite is true with the Liberty County Commission.
Since 1990, Earl Jennings, a black, has served as one of the five
county commissioners.  See *Defs.' Ex.* 4A (*from 1991 Trial*);
*Stanley Affs.*, Docs. 133 & 148.  As stated earlier, blacks make
up 17.63 percent of the total population and 25.03 of the voting
age population of Liberty County.  See CENSUS at 31, 40.  Thus,
with blacks comprising twenty percent of the county commission's
membership, blacks have clearly achieved proportional
representation on the county commission.  Such proportional
representation does not automatically preclude a finding of
section 2 liability, although it is obviously some evidence that

blacks have equal access to the political process in Liberty
County.   See DeGrandy, ___ U.S. at ___, 114 S. Ct. at 2661-62.

**D.   Conclusion Under the Totality of the Circumstances Test:**

Generally, "it will be only the very unusual case in which
the plaintiffs can establish the existence of the three Gingles
factors but still have failed to establish a violation of section
2 under the totality of the circumstances."[114]   Jenkins, 4 F.3d
at 1135.   This is such a case.   After engaging in "an intensely
local appraisal of the design and impact" of the two challenged
voting systems, the Court must conclude that Plaintiffs have
failed to establish section 2 liability as to both of those
systems.   Gingles, 478 U.S. at 79, 106 S.Ct. at 2781.

Liberty County still has a long way to go in eliminating the
vestiges of past discrimination.   Racism is still present among
many residents.   The county remains geographically divided
between whites and blacks, with each racial group attending
separate churches and participating in different civic
organizations.   Blacks suffer from significant socio-economic
disparities in housing, income, and education.   Finally, there is
evidence of a high degree of racially polarized voting by both
blacks and whites in the county, although it appears there is
less polarization now than there was when this case was
originally tried in 1986.

---

[114]   Obviously, there have been many exceptions to this general
rule.   See generally Johnson v. Mortham, 926 F. Supp. at 1476 n.27
(collecting citations of cases where no section 2 liability was
established even when racially polarized voting and historical and
socio-economic disparities existed).

Notwithstanding all of this otherwise compelling evidence,
Plaintiffs have failed to show that the continued use of the
existing at-large voting structure has actually resulted in
blacks having "less opportunity than other members of the
electorate to participate in the political process and to elect
representatives of their choice." 42 U.S.C. § 1973(b).  The
evidence is unrefuted that there are no official blocks to the
political process.  Similarly, even in the face of significant
economic disparities with whites, black voter registration and
turnout is consistently higher than it is for whites, blacks are
not precluded from effective campaigning, and blacks have full
and equal access to the ballot box.  Black voters' candidates of
choice have been allowed to participate in the unofficial
candidate slating process, with varying degrees of success.
There have been no racial appeals in recent county campaigns
because white and black candidates alike appreciate the
importance of securing the electoral support of the black
community.  Racial animus within the community is the unusual
exception, and not the rule.  Elected officials are responsive to
the needs of the black community.  No tenuous policy underlies
the at-large district, which was approved by a majority of voters
(including a majority of blacks) in a county-wide referendum in
1990.  Finally, a black county commissioner, Earl Jennings, has
enjoyed sustained electoral success since 1990 --- giving blacks
in Liberty County roughly proportional representation on the
county commission.

Based upon this "comprehensive, not limited, canvassing of relevant facts" [Johnson v. DeGrandy, ___ U.S. at ___, 114 S. Ct. at 2657], the Court holds that blacks have equal access to the political process in elections for the Liberty County Commission and the Liberty County School Board. Thus, judgment must be entered for Defendants on Plaintiffs' section 2 claims.

**E.   Plaintiffs' Constitutional Claims:**

Plaintiffs also claim that the at-large election of members of the Liberty County School Board dilutes black votes in violation of the Fourteenth and Fifteenth Amendments. Plaintiffs are correct that two elements must be proved to establish a constitutional claim of vote dilution --- a discriminatory purpose in either the enactment or maintenance of the election scheme, and a dilution of the minority's voting power. Lucas v. Townsend, 967 F.2d 549, 551 (11th Cir. 1992) (per curiam), reh'g denied, 979 F.2d 1540.

The evidence stated above --- particularly the results of the 1990 county-wide referendum --- shows that there is no discriminatory purpose in the continued use of at-large voting for school board elections in Liberty County. Moreover, the Court concludes that under the totality of the circumstances, blacks in Liberty County suffer no dilution of their votes as a result of the at-large voting system. This conclusion is based on the same analysis used in assessing Plaintiffs' claims under the Voting Rights Act. Accordingly, judgment must also be entered for Defendants on this claim.

Based upon the foregoing, it is hereby

**ORDERED AND ADJUDGED:**

1.    Plaintiffs' motion requesting entry of final judgment in their favor (Doc. 144) is DENIED.

2.    Defendants' requests for judicial notice of adjudicative facts (Docs. 133 & 148) are GRANTED.

3.    The Court finds that Plaintiffs have failed to prove their claims of vote dilution under section 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973, as amended.

4.    The Court finds that Plaintiffs have failed to prove their claim of vote dilution under the Fourteenth and Fifteenth Amendments to the United States Constitution.

5.    The clerk is directed to enter judgment for Defendants against the Plaintiffs as to all claims, and close this case.

DONE AND ORDERED this _31st_ day of _March_, 1997.

_____
MAURICE M. PAUL, CHIEF JUDGE

CIV 31
(Rev 5/83)

# JUDGMENT IN A CIVIL CASE

| United States District Court | Northern District of Florida |
|---|---|

| Case Title: | Docket Number |
|---|---|
| GREGORY SOLOMON, et al. | 85-7009 MMP |
| V. | Name of Judge or Magistrate Judge |
| LIBERTY COUNTY, FLORIDA, et al. | CHIEF JUDGE MAURICE M. PAUL |

☐ **Jury Verdict.** This action came before the Court and a jury with the judicial officer named above presiding. The issues have been tried and the jury has rendered its verdict.

X **Decision by Court.** This action came to trial or hearing before the Court with the judge (magistrate judge) named above presiding. The issues have been tried or heard and a decision has been rendered.

## IT IS ORDERED AND ADJUDGED

Judgment is entered in favor of Defendants Liberty County Commissioners, Liberty County School Board, L. Arnold, Commissioner Reddick, John Sanders, Donnie Coxwell, Earl Jennings, James Bilbow, Donnie Phillips, Joe Collins, Herbert Whittaker, and Tommy Duggar and against Plaintiffs Gregory Solomon, Patricia Beckwith, and Raleigh Brinson as to all claims.

ROBERT A. MOSSING, CLERK

By Deputy Clerk: Dianne Snell

*Dianne Snell*

April 1, 1997

ENTERED ON DOCKET April 1, 1997 BY ds
(Rules 58 & 79(a) FRCP or 32(b)(1) & 55 FRCRP)

Copies mailed to:  Hosford, Lacroix, Lipman, Weisberg,

COB

FILED